J-A25015-19

2020 PA Super 106

| | |
|---|---|
| FRANCISCO ROLON, ADMINISTRATOR OF THE ESTATE OF MARIA SANCHEZ-RODRIGUEZ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TRYSTAN H. DAVIES, M.D., LANCASTER EMERGENCY ASSOCIATES, LTD., MATTHEW C. WIGGINS, M.D., LANCASTER RADIOLOGY ASSOCIATES, LTD., JOSEPH F. VOYSTOCK, M.D., SURGICAL SPECIALISTS OF LANCASTER, P.C. AND LANCASTER GENERAL HOSPITAL | |
| Appellees | No. 2046 MDA 2018 |

Appeal from the Judgment Entered November 13, 2018
In the Court of Common Pleas of Lancaster County
Civil Division at No: CI-12-04424

BEFORE:  STABILE, McLAUGHLIN, and MUSMANNO, JJ.

OPINION BY STABILE, J.:                **FILED APRIL 28, 2020**

Appellant, Francisco Rolon, as administrator of the estate of Maria Sanchez-Rodriguez, appeals from the November 13, 2018 judgment entered in favor of Appellees, Trystan H. Davies, M.D., Lancaster Emergency Associates, LTD., Matthew C. Wiggins, M.D., Lancaster Radiology Associates, Ltd., Joseph F. Voystock, M.D., Surgical Specialists of Lancaster, P.C. and Lancaster General Hospital.  We affirm in part, vacate in part, and remand.

On April 30, 2010, Dr. Voystock, of Appellee Surgical Specialists of Lancaster, performed a hemicolectomy on Maria Sanchez-Rodriguez ("Decedent") at Appellee Lancaster General Hospital ("LGH"). The hemicolectomy was an emergency surgery to address a bowel perforation that occurred during a routine colonoscopy. On May 19, 2010, Decedent went to the LGH emergency room ("ER") complaining of pain in her right lower back, right hip, and right leg. The leg was swollen and blue. Appellee Trystan Davies, M.D., of Appellee Lancaster Emergency Associates, Ltd., examined Decedent in the ER. Dr. Davies noted that Decedent's right leg was colder and had a weaker pulse than the left. Dr. Davies ordered an ultrasound to check for a blood clot, *i.e.* deep vein thrombosis ("DVT"), in Decedent's lower leg. Appellee Matthew Wiggins, M.D., of Appellee Lancaster Radiology Associates, Ltd. interpreted the results of the ultrasound to reveal no DVT in the lower right leg, but slow blood flow in some of the veins. He recommended further testing.

Dr. Davies requested a consultation from Dr. Voystock to determine whether an arterial problem was causing Decedent's symptoms. Dr. Voystock ordered an arterial study, and it revealed no evidence of arterial blockage. The negative arterial study, combined with the improvement in Decedent's symptoms during the hours she spent in bed in the hospital, led to her discharge. Within one hour of discharge, Decedent collapsed in the elevator of her apartment building and was returned to the ER via ambulance. ER

personnel were unable to revive her. An autopsy revealed Decedent, age 61, died from a pulmonary embolism.

Appellant filed this medical malpractice action on March 29, 2012, alleging that Appellees' negligence led to the death of his wife, Maria Sanchez-Rodriguez. A jury trial commenced on October 15, 2018. Appellant presented David R. Campbell, M.D. as an expert witness on Dr. Voystock's alleged negligence. At the close of Appellant's case, Dr. Voystock and his practice, Surgical Specialists of Lancaster, P.C., moved for a nonsuit, claiming Campbell did not offer his opinion to a reasonable degree of medical certainty in accord with Pennsylvania law. The trial court granted Dr. Voystock's motion on October 19, 2018. On October 22, 2018, the jury returned defense verdicts in favor of the other Appellees. The trial court denied Appellant's timely post-trial motion to remove the nonsuit, and judgment was entered on November 13, 2018. This timely appeal followed. Appellant presents two questions:

1. Whether the trial court erred in granting nonsuit in favor of [Dr. Voystock] and denying [Appellant's] post-trial motion to remove nonsuit and for a new trial where [Appellant's] expert testimony was rendered to the requisite degree of medical certainty?

2. Whether the trial court erred in granting nonsuit in favor of [Dr. Voystock] and denying [Appellant's] post-trial motion to remove nonsuit and for a new trial where [Appellant] presented a *prima facie* case against [Dr. Voystock]?

Appellant's Brief at 5.[1]

---

[1] Appellant preserved these issues in a *nunc pro tunc* Pa.R.A.P. 1925(b) statement filed with the trial court's permission.

The applicable standard of review is as follows:

> In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established. Indeed, [w]hen a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement.... The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

*Vicari v. Spiegel*, 936 A.2d 503, 509 (Pa. Super. 2007) (internal citations and quotation marks omitted), *affirmed*, 989 A.2d 1277 (Pa. 2010).[2]

Medical malpractice is a form of negligence. *Griffin v. University of Pittsburgh Med. Ctr.-Braddock Hosp.*, 950 A.2d 996, 999 (Pa. Super. 2008), *appeal denied*, 970 A.2d 431 (Pa. 2009). To make a *prima facie* case a plaintiff must establish that the physician owed the plaintiff a duty and breached it; that the breach was the proximate cause of the plaintiff's harm; and that the alleged damages were a direct result of the harm. *Id.* at 999-1000 (quoting *Quinby v. Plumsteadville Fam. Practice, Inc.*, 907 A.2d 1061, 1070-71 (Pa. 2006)). The plaintiff must present expert testimony "where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson." *Id.* at 1000 (quoting *Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys.*, 903 A.2d 540, 563 n.11 (Pa. Super. 2006), *appeal denied*, 917 A.2d 315 (Pa. 2007)).

---

[2] Our Supreme Court in *Vicari* addressed expert qualifications, a matter not at issue here.

An expert must testify, to a reasonable degree of medical certainty, that the defendant physician deviated from acceptable standards, and that the deviation was the proximate cause of the plaintiff's harm. **Vicari**, 936 A.2d at 510. Further, "a medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." **Id.** (quoting **Smith v. Grab**, 705 A.2d 894, 899 (Pa. Super. 1997)).

> In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety. That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty. Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, 'reasonable degree of medical certainty.' **See Commonwealth v. Spotz**,[…] 756 A.2d 1139 (Pa. 2000) (indicating that '[i]n this jurisdiction, experts are not required to use 'magic words'' but, rather, 'this Court must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation'). Nevertheless, [a]n expert fails this standard of certainty if he testifies that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result.

**Id.** at 510-11 (some internal citations and quotation marks omitted).

In **Vicari**, the expert's opinion did not include the words "reasonable degree of medical certainty." **Id.** at 508. Notwithstanding that omission, this Court concluded that the expert's testimony, viewed in its entirety, met the requisite standard. **Id.** at 511. The expert "rendered an opinion that the risk

of harm was increased by the defendant's failure to refer [the plaintiff] to a medical oncologist for chemotherapy following her surgery[.]" *Id.* The expert testified that there was "'very great' potential for recurrence and metastasis[;]" that the plaintiff "absolutely" should have been referred to an oncologist; and that the plaintiff "was deprived of a significant opportunity for treatment which significantly increased the risk to her of local regional occurrence of metastasis[.]" *Id.* It was impossible to determine whether and to what extent chemotherapy would have prolonged the plaintiff's life, and in that context the expert used the word, "may." *Id.* at 512. Nonetheless, the testimony, considered in its entirety, was sufficient to permit the case to go to the jury. *Id.*

In *Griffin*, the plaintiff underwent bowel surgery and began to experience pain in her shoulder after the surgery. *Griffin*, 950 A.2d at 998. Her shoulder required several surgeries to repair a fracture and dislocation. *Id.* She filed a malpractice action alleging that the injury to her shoulder would not have occurred in the absence of negligence on the part of the hospital and its personnel. *Id.* The plaintiff's expert testified that her injury was either the result of forcible restraint because she became combative, or a grand mal seizure. *Id.* He assigned a 51% probability to the former and a 49% probability to the latter: "I think that from a reasonable degree of medical certainty, that is choosing one or the other, a *fifty-one to forty-nine percent* consideration, I think that the *least implausible* consideration

would be […] her shoulder was injured in attempts to be restrained because she was resisting that." *Id.* at 1002 (emphasis in original). The plaintiff had no recollection of the circumstances of her injury. *Id.* A jury awarded her more than $2 million and the defendant hospital appealed. *Id.* at 998. This Court concluded the expert's opinion was insufficient, despite his use of the words "reasonable degree of medical certainty." *Id.* at 1003-04. A 51% to 49% probability of forcible restraint as compared to a seizure did not "equate to an opinion stating to a reasonable degree of medical certainty the negligent forcible restraint caused [the plaintiff's] injury." *Id.* We therefore remanded for entry of judgment in the hospital's favor.

Similarly, in *Corrado v. Thomas Jefferson Univ. Hosp.*, 790 A.2d 1022 (Pa. Super. 2001), the expert testified that, "more likely than not in my opinion [defendant] deviated from the standard of care." *Id.* at 1031. The expert also said, "more likely than not [the decedent] would have responded to [timely] treatment." *Id.* This Court affirmed the trial court's entry of nonsuit. *Id.*

Instantly, Dr. Campbell testified that DVT is common in patients who are immobile after surgery. N.T. 10/17/18, at 165. He also testified that a lung or heart problem would cause symptoms in both legs, whereas Decedent had symptoms in only one. *Id.* at 164. Since Decedent underwent surgery less than three weeks before returning to the ER, since she had symptoms in only one leg, and since and ultrasound revealed no DVT in her lower leg but

pointed to a problem higher up, Dr. Campbell opined that Dr. Voystock should have checked for a problem higher up. *Id.* at 166-67. Dr. Campbell testified that an isolated clot in the pelvic area is rare but much more likely to cause death than a clot lower down. *Id.* at 201-02. Dr. Campbell opined that the ultrasound of Decedent's lower leg pointed to a problem in the pelvic region, and under these circumstances Dr. Voystock "had to" rule out a pelvic clot. *Id.* at 213. Further, Dr. Campbell testified that Dr. Voystock's diagnosis did not explain Decedent's symptoms. *Id.* at 172. Dr. Voystock's diagnosis would have explained blue discoloration in Decedent's toes, but not her whole leg. *Id.* A dose of Heparin and anticoagulant would have significantly lessened the chance that Decedent would die from a pulmonary embolism. *Id.* at 178-79. Furthermore, because symptoms of DVT improve with bedrest, Decedent's improvement during her time in the ER did not support the conclusion that she was ready for discharge. *Id.* at 171.

Having summarized the substance of Dr. Campbell's testimony, we now examine the passages that led the trial court to find that Dr. Campbell failed to offer an opinion to a reasonable degree of medical certainty. Dr. Campbell works in Boston, and he explained that he is accustomed to offering his opinions as "more likely than not," which is the Massachusetts standard. *Id.* at 210-11. He also testified that "more likely than not" and "reasonable degree of medical certainty" mean the same thing to him. *Id.* at 211.

On direct examination,[3] Dr. Campbell testified as follows:

> Q.     Okay.  Doctor, based on your review of the records and the deposition of Dr. Voystock and the other depositions in this case, did you come to an opinion to within a reasonable degree of medical certainty as to whether or not Dr. Voystock violated the standard of care in his care and treatment of this patient?
>
> A.     I did.
>
> Q.     And what was your opinion?
>
> A.     That he did.
>
> Q.     And why was that?
>
> A.     Because I felt the diagnosis of likely DVT with attendant consequences of a pulmonary embolism was so apparent that I would have expected a medical student to make that diagnosis and the consequence of failing to make it can be extreme.  So I think the – I think it's required that one – one follow through on that.

*Id.* at 176-77.

Dr. Campbell also addressed the consequences of failing to do a follow up study of the Decedent's pelvic area:

> Q.     Doctor, do you have an opinion to within a reasonable degree of medical certainty as to whether or not the failure to follow up and get the necessary study as you indicated increased

---

[3] The pertinent transcripts do not appear in the certified record, but Appellant has included them in the reproduced record.  Their accuracy is not in dispute.  Appellant is obligated, under Pa.R.A.P. 1921, to supply this Court with a complete certified record.  In these circumstances, however, we will not deem Appellant's argument waived.  *See Washburn v. Northern Health Facilities, Inc.*, 121 A.3d 1008, 1014 n.2 (Pa. Super. 2015) (declining to find waiver where a pertinent transcript, whose accuracy was undisputed, was included in the reproduced record but not the certified record).

the risk of harm and was a substantial factor in the patient's ultimate death?

    A.    I do.

    Q.    And what is your opinion?

    A.    Well, my opinion is that if the diagnosis of DVT had been made, and the large dose of Heparin given right away, even if the patient had thrown that pulmonary emboli while in the hospital, the risk of mortality would have been significantly less. So I think it was the factor that led to the death.

    Q.    And what would, in fact, be the course of treatment for a patient like this if DVT in the pelvis was found?

    A.    You would have given them a large dose of Heparin and anticoagulant.

    Q.    And would that – what is the likelihood then that the patient would survive with this clot at that point in time?

    A.    You – you can – you can't say with absolute certainty, but you can say more likely than not, if it was treated, and the Heparin was on board, that the way an embolism causes death is it causes vasoconstriction of the pulmonary arteries when it lands and we know that it's part of our treatment of the disease. The first thing you need to do is get some Heparin into them to vasodilate them. And if you can do that right away, the outcomes are better.

    So I think it's more likely than not that she could have survived if she had had that treatment at that time.

    Q.    Even with the – with the thrombosis still present in the pelvis?

    A.    Oh, yes. If the thrombosis had broken off after she had started treatment, I think the outcome of death from a pulmonary emboli was much, much, much less likely.

*Id.* at 178-79. Thus, Dr. Campbell testified, in response to counsel's question,

that he held his opinion to a reasonable degree of medical certainty. He also

testified that, had Dr. Voystock adhered to the standard of care, Decedent's survival was more likely than not.

Defense counsel explored Dr. Campbell's degree of certainty on cross-examination:

> Q. As I understand your direct testimony, the symptoms in this patient's right leg when she presented to the emergency department were related to an isolated pelvic clot?
>
> A. They're entirely consistent with that.
>
> Q. Well, are they consistent with that or is that what you're saying actually happened here?
>
> A. Back to my comment that half of the patients with deep vein thrombosis with no symptoms and half with symptoms do not have deep vein thrombosis. So there's no absolute certainty relating to symptoms to the diagnosis which is why you always have to think about it.
>
> Q. So I just want to make sure I understand. Can you say with a reasonable degree of medical certainty that the patient[']s presenting symptoms in the emergency department that day were related to an isolated pelvic clot?
>
> A. They were entirely consistent with an isolated clot.
>
> Q. But that's not what I asked you. Can you say with a reasonable degree of medical certainty that the patient[']s presenting symptoms in the ED were related to an isolated pelvic clot?
>
> A. Well, I can say in this case they were.
>
> [...]
>
> Q. So now I just want to make sure I understand. Isolated pelvic DVTs happen in 1 percent of the cases. And now we have an isolated pelvic DVT, the symptoms of which the night before don't go away when you lie in bed but miraculously the next day when you lie in bed they go away?

- 11 -

A.     I think I told you that half the patients have no symptoms and half the patients don't.  It's a very difficult disease to pin symptoms by which is why if you have a suspicion you have to do a full evaluation otherwise patients will die from a pulmonary embolism.

*Id.* at 202, 208-09.   Thus, when defense counsel inquired about Dr. Campbell's degree of certainty based on Decedent's symptoms, Dr. Campbell responded that Decedent's symptoms were "entirely consistent" with DVT.  He also testified that a patient's observable symptoms are not a reliable way to diagnose DVT.

Appellant's counsel pursued this issue on redirect:

Q.     She presented to the hospital.   You've read the medical records.   You've read the deposition, reports, was her presentation consistent with a pelvic DVT?

A.     Yes.

Q.     And a pelvic DVT is one large enough that it could cause a death like this; is that correct?

A.     Pelvic DVTs are much more likely to cause a death like this than DVTs involving the lower leg because it's a bigger vein with a bigger clot.  It has greater impact when it lands.

Q.     And that's because she had, among other things, swelling and pain; is that correct?

A.     Well, that's a symptom.  She had the clot.  And the symptoms depend upon how – how – how much exercise she's doing and so forth.  Back to that difficulty of relating symptoms directly to – to the amount of –  to what's happening.  Half the time you're right and half the time you're not.  But this is a classic case.  Postoperatively you need to take it seriously at that time when they visit.

Q.     And there was a subsequent noninvasive ultrasound, correct?

A.    Correct.

Q.    And that pointed to the fact that there was some sort of blockage or some sort of obstruction in the pelvic region that we already talked about?

A.    Correct.

Q.    And that blockage or that obstruction of the pelvic region in your opinion was due to what?

A.    It was due to deep vein thrombosis. Yeah.  And you had to rule it out.  I would add that the symptoms of a large swollen leg could really only have come from iliac deep vein thrombosis because a lower DVT would not have caused the whole leg to swell up in that probability.

Q.    And so because you have that presentation the next step that must be done is proper testing in order to see whether or not a DVT is in that area?

A.    Yes.  You at least have to look at the noninvasive to look at the phasic, loss of respiratory variation, and that was – wasn't – it caused the radiologist to say, you've got to do further tests and that – and that's exactly what you should have done in that case.

*Id.* at 212-14.

Also on redirect, Appellant's counsel examined Dr. Campbell on his degree of certainty in his opinions:

Q.    And [defense counsel] also went over with you this issue of reasonable degree of medical certainty versus more probable than not.  When you say that those are the same to you, do you mean that those are the same sort of –

[Defense counsel]:  Objection, Your Honor.  This is leading.

THE COURT:  Sustained.

Q.    What do you mean by that?

- 13 -

A.      Oh, so if I think this is very likely to be the case, I use that term because that's what my lawyers tell me I'm supposed to do.

Q.      Okay.   And in – her in Pennsylvania, reasonable degree of medical certainty, do you feel comfortable with your opinions rendering them to within a reasonable degree of medical certainty?

A.      I'm very comfortable rendering my opinions.  I don't personally know the definition of reasonable degree of medical certainty, **but I'm quite certain my opinions are correct.**

Q.      **You're quite certain about your own opinions?**

A.      **Yes.**

Q.      **And you are certain about these opinions that you've rendered in this case?**

A.      **I am, indeed.**

*Id.* at 217-18 (emphasis added).

The instant circumstances are very similar to those of *Vicari*.  As we explained above, the expert in that case testified that the defendant's failure to refer the decedent to a medical oncologist deprived the decedent of an opportunity for treatment and increased the risk of a recurrence of cancer. *Vicari*, 936 A.2d at 511-12.  The expert used conditional language in places because it was impossible to state with certainty that the chemotherapy would have worked and prolonged the decedent's life.  *Id.* at 512.  Similarly, in the instant case, the import of Dr. Campbell's testimony is that Dr. Voystock breached the standard of care by failing to diagnose DVT and treat Decedent accordingly.  He stated he was certain of his opinion, and he explained that the ultrasound of Decedent's lower leg evidenced a blockage higher up.  The

ultrasound results, in tandem with Decedent's recent surgery, led Dr. Campbell to opine that a pelvic DVT, despite its rarity, had to be ruled out in this case. Thus, not only did Dr. Campbell express his certainty as to his opinion, he provided a thorough explanation of how he arrived at that opinion given the evidence before him. Dr. Campbell also explained why the evidence did not support Dr. Voystock's diagnosis.

Dr. Campbell used conditional language when discussing the possibility that Heparin and an anticoagulant would have helped. He said it was "more likely than not" that she would have survived had she been treated, and in his very next answer said death was "much, much, much less likely" had she been treated. N.T. 10/17/18, at 179. Conditional language was necessary because, as Dr. Campbell acknowledged, it was impossible to state with absolute certainty that treatment would have worked. *Id.*

Here, as in *Vicari*, the expert testimony evidenced a breach of the applicable standard of care that increased the risk of harm to the decedent. Dr. Campbell expressed his opinion with certainty and gave a detailed analysis of the facts that he believed supported his opinion. Under *Vicari*, Dr. Campbell's testimony was more than sufficient to create a jury issue. The trial court erred denying Appellant's motion to remove the nonsuit.

To avoid this result, Appellees rely on various statements that, taken in isolation, could support a conclusion that Dr. Campbell was not sufficiently certain of his opinion. Appellees cite Dr. Campbell's statement that he

discerns no difference between Pennsylvania's "reasonable degree of medical certainty" standard and Massachusetts' "more likely than not" standard as evidence that he was not sufficiently certain of his opinion. N.T. 10/17/18, at 211. We disagree. Dr. Campbell acknowledged that he uses the legal phasing a lawyer requests. *Id.* at 217. Thus, "in medicolegal terms in Massachusetts, you have to say more likely than not and that's what we do and it becomes a habit. When you're making a statement, **I really think this is what happened here,** I say more likely than not." *Id.* at 211 (emphasis added). In Pennsylvania, he used "reasonable degree of medical certainty." *Id.* at 217-218. Regardless of the legal terminology, Dr. Campbell was certain of his opinion. *Id.* at 218.

Appellees also criticize Dr. Campbell for stating, on cross examination, that Decedent's symptoms were "entirely consistent" with a pelvic DVT. Citing *Vicari*, in which this Court explained that words and phrases such as "possibly," "could have," "could very properly account," and "very highly probable" do not meet the standard (*Vicari*, 936 A.2d at 511), they argue that "entirely consistent" is similarly insufficient. Once again, Appellees invite this Court to consider an isolated statement rather than the entirety of the testimony. Dr. Campbell explained that DVT is difficult to diagnose based on observable symptoms. N.T. 10/17/18, at 209. Some patients with symptoms consistent with DVT do not have it; others with no symptoms have it. *Id.* But Decedent's observable symptoms were only one piece of evidence that Dr.

Campbell considered. In addition to the symptoms, Decedent's recent surgery and the ultrasound results led Dr. Campbell to opine that Dr. Voystock should have done further testing to check for a pelvic DVT. Thus, in using the words "entirely consistent," Dr. Campbell said as much as he accurately could have said about Decedent's observable symptoms.

For all of the foregoing reasons, we conclude Dr. Campbell rendered his testimony to a reasonable degree of medical certainty. The trial court erred in entering nonsuit in favor of Dr. Voystock and his practice, Surgical Specialists of Lancaster, P.C.

Next, we consider Appellant's argument that he is entitled to a new trial against all Appellees rather than a new trial limited to Dr. Voystock and his practice, Surgical Specialists of Lancaster, P.C., the successful nonsuit movants. Prior to this brief to this Court, Appellant never addressed the parties against whom he sought a new trial. His post-trial motion and Pa.R.A.P. 1925(b) statement are silent on the issue. Likewise, his questions presented do not specifically raise this question.

Appellant relies on **Eck v. Powermatic Houdaille**, 527 A.2d 1012, 1021 (Pa. Super. 1987), in which this Court wrote, "It is the normal practice in granting a new trial to grant it generally against all parties on all issues." Assuming without deciding that a motion for new trial presumptively requests a new trial against all defendants, we find no merit in Appellant's argument. **Eck** was a strict products liability case involving an arbor saw whose guard

had been removed by the end user. The injured plaintiff sued the product's manufacturer and distributor. The jury entered defense verdicts. *Id.* at 1016. This Court held that the trial court gave an erroneous jury instruction on the issue of substantial change to the product. *Id.* at 1014. In limited analysis of the scope of the new trial, the *Eck* Court noted that the faulty instruction could have affected the jury's decision on defect and causation, as those issues were inextricably interwoven in that case. *Id.* at 1021. The *Eck* Court did not analyze the need for a new trial as to all defendants, and there is no indication that any party to that case raised the issue.

Appellant also cites *Westinghouse Elevator Co. v. Herron*, 523 A.2d 723 (Pa. 1987), in which the plaintiff, injured in an elevator, sued the building owner, the elevator manufacturer, and the elevator maintenance contractor. The original defendants joined the building manager, the building maintenance contractor, and the former elevator maintenance contractor. *Id.* at 724. Each defendant's strategy was, in part, to blame some or all of the others. *Id.* at 725. Counsel for Westinghouse took ill during trial, and, after several continuances, the trial court ordered Westinghouse to continue with substitute counsel. *Id.* Defendants moved for a new trial after plaintiff won a verdict of nearly $2 million. *Id.* The trial court granted a new trial and this Court reversed. *Id.* Our Supreme Court concluded that Westinghouse was prejudiced by the loss of its counsel during a very complicated case. *Id.* at 726-728. In the final paragraph of its opinion, the Supreme Court wrote:

It remains, finally, to determine whether the new trial in this case should be conducted with respect to all parties, or only with respect to those parties who were not exonerated in the first trial. Without relying on any general rule of law as to when retrial must involve all parties, we agree with the trial court that this particular case requires a retrial as to all parties because the denial of adequate legal representation to Westinghouse precluded it not only from presenting an effective defense to the claims of the plaintiff, but also from effectively asserting that its co-defendants were responsible for plaintiff's injuries.

*Id.* at 728. ***Westinghouse*** is easily distinguishable from the case before us. First, it was an appeal from a plaintiff's verdict. Second, one defendant lost its counsel mid-trial in a complicated case where each of the many defendants was blaming the others. A retrial against a single defendant might have been prejudicial to that defendant. The ***Westinghouse*** Court expressly relied on the circumstances before it, rather than any general rule of law, in granting a new trial as to all defendants. The ***Westinghouse*** opinion does not support a conclusion that a new trial is necessary against all defendants in all cases.

More pertinent to the instant case is ***Meyer v. Heilman***, 469 A.2d 1037 (Pa. 1983), in which the plaintiff sued a tractor's owners in negligence and its manufacturer in strict liability. *Id.* at 1039. The trial court entered a nonsuit in favor of the manufacturer, and the owners won a defense verdict. *Id.* This Court reversed the nonsuit and awarded plaintiff a new trial against all defendants. *Id.* This Court reasoned that a new trial against all defendants was necessary because the manufacturer claimed the owners were negligent for removing a safety shield from the tractor. *Id.* (quoting ***Meyer v.***

- 19 -

*Heilman*, 452 A.2d 1376, 1379 (Pa. Super. 1982). Our Supreme Court

granted allowance of appeal as to that question and reversed. *Id.*

The Supreme Court reasoned that the defendant owner was placed in

the disadvantageous position of defending on its own after the nonsuit against

the manufacturer. *Id.* at 1040. And yet, the owner won a defense verdict:

*Id.*

> [The plaintiffs'] claim against [the owner] was adjudicated
> on the merits. [The manufacturer's] lack of input as to that claim
> was of its own making, since it took the affirmative step of moving
> for a compulsory non-suit at the first trial. Now that [the
> manufacturer] will be compelled to defend itself in a new trial, it
> has no right to proceed with its original co-defendants, who were
> exonerated at the first trial, as if the non-suit and subsequent
> adjudication as to these co-defendants had never occurred.

*Id.*

Turning to the plaintiffs' interest in retrying both defendants, the

Supreme Court noted that "the gist of [plaintiffs' argument before this Court

is that they were improperly denied the benefit of [the manufacturer's]

evidence as to the [owner's] negligence." *Id.* The Supreme Court rejected

that contention:

> Unless the question of liability is so evident that it can be
> ruled upon as a matter of law by the court, the evidence is for the
> jury's consideration. If the jury finds one defendant negligent and
> exonerates another, the factual issue has been resolved. *Absent
> reversible error ... the defendant who has been absolved from
> negligence should not be subjected to a new trial.*

*Id.* (quoting *Stokan v. Turnbull*, 389 A.2d 90, 93 (Pa. 1978)) (italics added

in *Meyer*). The *Meyer* Court concluded that *Stokan* applied, even though

the manufacturer won a nonsuit rather than a jury verdict. *Id.* The erroneous entry of nonsuit required a new trial against all defendants only if that error "casts serious doubt on the jury verdict" against the owners. *Id.* at 1041.

The *Meyer* Court noted that Rule 2229(b)[4] of the Pennsylvania Rules of Civil Procedure permits a plaintiff to join two or more defendants but does not create an absolute right to do so, inasmuch as the trial court has discretion to sever a joint trial under Rule 213(b).[5] Even in cases of joinder, the causes of action against each defendant remain distinct and the jury will decide each separately. *Id.* The *Meyer* Court concluded that the nonsuit against the

_____

[4] Rule 2229(b) reads as follows:

> (b) A plaintiff may join as defendants persons against whom the plaintiff asserts any right to relief jointly, severally, separately or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences if any common question of law or fact affecting the liabilities of all such persons will arise in the action.

Pa.R.C.P. No. 2229(b).

[5] Rule 213(b) provides:

> (b) The court, in furtherance of convenience or to avoid prejudice, may, on its own motion or on motion of any party, order a separate trial of any cause of action, claim, or counterclaim, set-off, or cross-suit, or of any separate issue, or of any number of causes of action, claims, counterclaims, set-offs, cross-suits, or issues.

Pa.R.C.P. No. 213(b) (preempted as stated in *Simmons v. Simpson House, Inc.*, 259 F. Supp.3d 200 (E.D.Pa. 2017).

manufacturer had no impact on the plaintiffs' case against the owners. *Id.* at 1041.

We believe *Meyer* controls the instant case. Here, as in *Meyer*, the remaining defendants won defense verdicts. Also similar to *Meyer*, Appellant's March 29, 2012 complaint raised distinct claims against each defendant. Appellant supported its causes of action against Dr. Davies (the ER doctor), Dr. Wiggins (the radiologist), and their respective practices, with different evidence and different expert witnesses. Each doctor played a different role in Decedent's treatment. Furthermore, Dr. Voystock and his practice did not move for nonsuit until the close of Appellant's evidence.[6] The nonsuit therefore did not hinder Appellant's ability to present his case to the jury. Here, as in *Meyer*, Appellant has failed to provide any persuasive explanation why the erroneous nonsuit against Dr. Voystock and his practice undermines the jury's verdicts in favor of the remaining defendants.

For all of these reasons, we will vacate the judgment in favor of Dr. Voystock and Surgical Specialists of Lancaster, P.C. and award Appellant a new trial against those parties only. We affirm the judgment in favor of all other defendants.

Judgment affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

---

[6] We observe that Dr. Voystock and his practice, in their joint brief, do not address the need for a new trial against all defendants.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/28/2020