J-A15016-21

2021 PA Super 217

| | | |
|---|---|---|
| FREDDY MUNOZ AND BEATRIZ MUNOZ, AS CO-ADMINISTRATORS OF THE ESTATE OF S.M., DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA | : | |
| ----------------------------------------- | : | |
| FREDDY MUNOZ | : | |
| | : | |
| v. | : | |
| | : | |
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA | : | |
| | : | |
| APPEAL OF: FREDDY MUNOZ AND BEATRIZ MUNOZ, AS CO-ADMINISTRATORS OF THE ESTATE OF S.M., DECEASED, AND FREDDY MUNOZ | : | No. 1798 EDA 2020 |

Appeal from the Judgment Entered September 14, 2020
In the Court of Common Pleas of Philadelphia County
Civil Division at No: No. 170403453

BEFORE: BOWES, J., STABILE, J., and MUSMANNO, J.

OPINION BY STABILE, J.:                          **FILED OCTOBER 27, 2021**

Appellants, Freddy Munoz and Beatriz Munoz, as Co-Administrators of the Estate of S.M., appeal from the September 14, 2020 order entered in the Court of Common Pleas of Philadelphia County, denying Appellants' motion to remove a nonsuit entered in favor of Appellee, The Children's Hospital of

Philadelphia ("CHOP"). The nonsuit was entered at the conclusion of Appellants' case-in-chief in their medical negligence action against CHOP and several co-defendants.[1] Appellants argue the trial court erred in granting—and refusing to remove—a nonsuit because there was ample evidence to demonstrate that CHOP undertook and provided healthcare services to S.M. We agree and, therefore, reverse and remand for removal of the nonsuit and a new trial.

For perspective, we note that much of the expert testimony presented in Appellants' case-in-chief addressed the care provided to S.M. by CHOP's co-

_____

[1] Pa.R.C.P. 230.1 (Compulsory Nonsuit at Trial) provides, in relevant part:

> (c) In an action involving more than one defendant, the court may not enter a nonsuit of any plaintiff prior to the close of the case of all plaintiffs against all defendants. The nonsuit may be entered in favor of
>
> (1) all of the defendants, or
>
> (2) any of the defendants who have moved for nonsuit if all of the defendants stipulate on the record that no evidence will be presented that would establish liability of the defendant who has moved for the nonsuit.

Pa.R.C.P. 230.1(c). Our review has not uncovered any stipulation in accordance with Rule 230.1(c)(2) that would authorize entry of a nonsuit in favor of fewer than all defendants. "Otherwise, the proper procedure for the moving defendant is to seek a directed verdict at the end of the trial." **Baird v. Smiley**, 169 A.3d 120, 125 (Pa. Super. 2017). While it appears the trial court did not explain its seeming departure from the rule, neither did the parties challenge the entry of a nonsuit in favor of CHOP only. Therefore, there is no issue before us with respect to the appropriateness of the court's order entering a nonsuit in favor of a single defendant.

defendants, including Einstein Medical Center-Elkins Park ("Einstein") and Stephen J. Parrillo, D.O. ("Dr. Parrillo"), the board-certified emergency medicine physician who treated S.M. in the Einstein emergency department ("the ED") on June 8, 2015. Following entry of the nonsuit in favor of CHOP, Appellants settled their claims against all remaining co-defendants. Therefore, while some discussion of the care provided by the co-defendants is addressed herein, our focus is on the role played by CHOP and its agents.

Our review of the record reveals that Freddy Munoz took his four-year-old son, S.M., to the Einstein ED on June 7, 2015, for treatment of a fever. S.M. had been treated at the same facility for pneumonia in January of 2015. At the conclusion of the June 7 visit, S.M. was discharged with a diagnosis of a herpes lesion on his lip, was given Ibuprofen, and was directed to follow up with his pediatrician in two days.

S.M. returned to the ED the following day because he had developed congestion and was having difficulty breathing. At 4:33 p.m., S.M. was seen by Dr. Parrillo. Lab tests revealed, *inter alia*, that S.M.'s oxygen levels and white blood count were extremely low and his heart rate was very high. Dr. Parrillo first diagnosed S.M. with asthma, then with cancer. An x-ray revealed pneumonia.

At 5:06 p.m., Dr. Parrillo called CHOP's emergency services department and informed CHOP of S.M.'s condition, which Dr. Parrillo described as an emergency. Dr. Parrillo was connected with CHOP's pediatric intensive care

unit ("PICU"), which agreed to admit S.M. Dr. Parrillo then engaged in a series of conversations with Matt Taylor, M.D. ("Dr. Taylor"), a pediatric intensive care fellow in CHOP's PICU.[2] After Dr. Parrillo described S.M.'s condition, Dr. Taylor suggested administration of saline and antibiotics. Dr. Taylor asked if Dr. Parrillo believed S.M. could "crash" and require intubation. Dr. Parrillo said he did not believe so but that he could intubate S.M. if necessary.

At approximately 5:41 p.m., CHOP advised Dr. Parrillo that a transport team was available and would arrive in approximately one hour.[3] The CHOP team included two pre-hospital nurses, Donna Galvin and Heather Maerten, both of whom had specialized training in intubating children and running codes under a physician's direction. The team did not include an intensivist physician, although CHOP's transport policy did provide for an intensivist to be part of the team for some patient transports, including "patient[s] with unstable vital signs and potential for loss of vital signs on transport." While the CHOP team was en route to Einstein, S.M. was provided oxygen through a mask.

The CHOP team arrived at Einstein at approximately 6:35 p.m. Nurse Galvin received a report from the Einstein nursing staff while Nurse Maerten

---

[2] All told, there were 22 conversations between CHOP and Einstein personnel.

[3] As a small facility, Einstein did not have a transport team of its own, and relied upon CHOP for transport.

went to the area in the ED where she located S.M. and his father and observed that S.M. was "blue." Nurse Galvin called CHOP, reported that S.M. was blue, that his oxygen saturation was very low at 80%, and that she was going to "get this kid intubated." At approximately 6:45 p.m., Dr. Parrillo administered a pre-intubation sedative and paralytic and, approximately seven minutes later, attempted—unsuccessfully—to intubate S.M. His second intubation attempt at 6:54 p.m. was similarly unsuccessful. The CHOP nurses were nearby, but neither participated in the intubation attempts. Testimony at trial revealed that Nurse Galvin had intubated many more pediatric patients than Dr. Parrillo, perhaps 30 or so to his five.

Dr. Parrillo attempted to increase S.M.'s oxygen levels with an Ambu bag and mask. By 6:56 p.m., S.M. had no detectable pulse and Einstein providers began CPR. Dr. Parrillo accepted a King's Airway device (an alternative to intubation) from the CHOP team and inserted it at 6:59 p.m. as CPR continued.

As the trial court explained:

At 7:03 p.m., S.M. regained his pulse. His oxygen level rose [to] between 90% and 96%, and CPR was discontinued. Nurse Galvin left the area and updated Dr. Taylor over the phone. During this phone call, Dr. Taylor suggested to Nurse Galvin that: any abnormalities to electrolytes be corrected; that S.M. receive bicarbonate, calcium gluconate, and another dose of epinephrine, and that a chest tube be considered. Nurse Galvin stood across the hall during this conversation, and repeated portions of the recommendations. [Appellants'] expert Dr. Paynter testified that Dr. Taylor's suggestions constituted "running the code." Upon cross examination however, Dr. Paynter elaborated that "if Nurse

Galvin is there conveying Dr. Taylor's suggestions and confirming, that's fine."

Trial Court Opinion, 12/18/20, at 6 (footnotes and some alterations omitted).

Subsequently, S.M. lost his pulse again and CPR was resumed, this time with Nurse Maerten taking turns with Einstein providers. At approximately 7:16 pm., after receiving Nurse Galvin's update call, Dr. Taylor engaged in a number of conversations with CHOP's transport service and arranged to send a second team to Einstein by ambulance, this time with an intensivist physician. (Sending a team by helicopter was not an option due to weather conditions.) The transport team would arrive in an hour. It was ultimately determined that the team would not arrive in time to assist in S.M.'s care. Therefore, a second team was not dispatched.

In the meantime, at 7:12 p.m., the first of two Einstein anesthesiologists arrived in the ED. Each unsuccessfully attempted to intubate S.M. S.M. was pronounced dead at 7:36 p.m.

As noted, at trial Appellants presented expert testimony addressing the treatment provided to S.M. by Einstein personnel as well as CHOP's involvement in S.M.'s care. At the conclusion of Appellants' case-in-chief, CHOP moved for a nonsuit. The trial court took the matter under advisement and, on February 18, 2020, granted CHOP's motion. Appellants then settled their claims against the remaining defendants.

On September 8, 2020, following argument, the trial court denied Appellants' post-trial motion seeking to remove the nonsuit. Judgment was

entered on the order denying post-trial motions and this timely appeal followed. Both Appellants and the trial court complied with Pa.R.A.P. 1925.[4]

Appellants present two issues for our consideration:

I. Did the trial court err in entering a nonsuit on the claims against CHOP based on [its] conclusion there is no evidence CHOP ever undertook to render a service to S.M., where [Appellants] presented evidence

- CHOP undertook to admit him to its PICU;

- CHOP's Dr. Taylor, a pediatric fellow with advanced training in critical care, advised Dr. Parrillo how to treat the little boy for sepsis;

- Dr. Taylor assembled a transport team of two nurses with advance training in emergency care and dispense [*sic*] them to Einstein for S.M.;

- the nurses assessed S.M.'s condition, Nurse Galvin told CHOP she was going to intubate him and both nurses advised Dr. Parrillo the child's situation was dire and he required intubation;

- when Dr. Parrillo's efforts to intubate S.M. failed, Nurse Galvin offered him the use of their King's airway;

---

[4] CHOP takes issue with Appellants' Rule 1925(b) statement, contending it presents issues in a boilerplate fashion and without the requisite specificity. While the Rule 1925(b) statement might not be a model of clarity, it is clear from the trial court's opinion that the court understood the matters for which Appellants were seeking review. The fact Appellants have not raised any issues in their brief that were not addressed in the trial court's Rule 1925(a) opinion is a reflection of that fact. Therefore, we decline to find waiver. *See* ***Fulano v. Fanjul Corporation***, 236 A.3d 1, 9 (Pa. Super. 2020) (citing ***Commonwealth v. Smith***, 955 A.2d 391, 393 (Pa. Super. 2008) (no waiver where trial court meaningfully addressed issues despite vague Rule 1925(b) statement)).

- after the anesthesiologist removed the King's airway and S.M. coded, Dr. Taylor gave the instructions on the medications to give and dosages and when to give them which Nurse Galvin called out to the staff;

- Nurse Galvin advised the nurses when they needed to start CPR and Nurse Maerten participated in providing it?

II. Did the lower court err in applying the **Althaus**[5] standard?

Appellants' Brief at 4-5.

In **Rolon v. Davies**, 232 A.3d 773 (Pa. Super. 2020), this Court reiterated the applicable standard of review as follows:

> In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established. Indeed, when a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

*Id.* at 776-77 (quoting **Vicari v. Spiegel**, 936 A.2d 503, 509 (Pa. Super. 2007)) (cleaned up), *affirmed*, 989 A.2d 1277 (Pa. 2010). Stated differently:

> On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor." **Agnew v. Dupler**, 553 Pa. 33, 717 A.2d 519, 523 (1998). The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.

---

[5] **Althaus v. Cohen**, 756 A.2d 1166 (Pa. 2000).

***Scampone v. Highland Park Care Ctr., LLC***, 57 A.3d 582, 595-96 (Pa. 2012). "The appellate court must review the evidence to determine whether the trial court abused its discretion or made an error of law." ***Baird***, 169 A.3d at 124 (citation omitted).

In ***Rolon***, this Court explained:

> Medical malpractice is a form of negligence. ***Griffin v. University of Pittsburgh Med. Ctr.-Braddock Hosp.***, 950 A.2d 996, 999 (Pa. Super. 2008), *appeal denied*, 970 A.2d 431 (Pa. 2009). To make a *prima facie* case a plaintiff must establish that the physician owed the plaintiff a duty and breached it; that the breach was the proximate cause of the plaintiff's harm; and that the alleged damages were a direct result of the harm. ***Id.*** at 999-1000 (quoting ***Quinby v. Plumsteadville Fam. Practice, Inc.***, 589 Pa. 183, 907 A.2d 1061, 1070-71 (2006)). The plaintiff must present expert testimony "where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson." ***Id.*** at 1000 (quoting ***Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys.***, 903 A.2d 540, 563 n.11 (Pa. Super. 2006), *appeal denied*, 917 A.2d 315 (Pa. 2007)).
>
> An expert must testify, to a reasonable degree of medical certainty, that the defendant physician deviated from acceptable standards, and that the deviation was the proximate cause of the plaintiff's harm. ***Vicari***, 936 A.2d at 510. **Further, "a medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm**." ***Id.*** (quoting ***Smith v. Grab***, 705 A.2d 894, 899 (Pa. Super. 1997)).

***Id.*** at 777 (emphasis added).

Appellants argue that, giving Appellants the benefit of all reasonable inferences of fact, the evidence was sufficient for a jury to conclude that the essential elements of a cause of action for medical negligence were

established against CHOP. Again, to establish the cause of action, a plaintiff must first establish that the provider owed a duty and breached it. Here, the trial court concluded that CHOP did not undertake to render services to S.M. and, therefore, did not owe any duty of care to S.M. under the Restatement (Second) of Torts, § 323.[6] Section 323 provides:

> One who undertakes, gratuitously or for consideration, to render serves to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a)    his failure to exercise such care increases the risk of
> >
> > such harm, or

_____

[6] The trial court's opinion does not include any analysis of the duty, or lack of duty, under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, because Appellants "failed to establish that CHOP owed S.M. a duty of care under state law[.]" Trial Court Opinion, 12/18/20, at 19. Simply stated, EMTALA requires that a transferring hospital stabilize a patient before transferring the patient to another hospital. We acknowledge CHOP's argument that it did not have any duty to S.M. under EMTALA because S.M. was not under CHOP's direct care, was never admitted to CHOP, and was not transferred to CHOP. Notes of Testimony, 2/14/20 (Afternoon Session), at 104. However, as the United States Court of Appeals for the Eleventh Circuit observed, "EMTALA was not intended to establish guidelines for patient care, [to] replace available state remedies, or to provide a federal remedy for medical negligence." *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) (citations omitted). As stated in EMTALA itself, "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395(dd(f). While there is no question that S.M. never left Einstein's facility, the question here is whether CHOP owed any duty of care to S.M. under Pennsylvania law, *i.e.*, under the Restatement (Second) of Torts, § 323.

> (b)  the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts, § 323.

In support of its finding that CHOP did not undertake to provide medical services to S.M., the trial court noted that "CHOP never transported S.M.; and . . . [Appellants] presented no evidence of a relationship between CHOP and [Appellants]." Trial Court Opinion, 12/18/20, at 15. The trial court relied on its findings that Appellants brought S.M. to Einstein, not CHOP; that emergency services were proved by Einstein physicians, not CHOP's; that "[n]o person from CHOP spoke to Mr. Munoz or S.M. directly or over the phone at any time"; that CHOP did not provide diagnostic tests or transport S.M.; and that no one from Einstein directed the CHOP team to take control of the code. *Id.*

However, the trial court continued—and in several respects seemed to contradict its own conclusion, noting:

> CHOP first learned about S.M.'s situation when [Dr.] Parrillo called CHOP's Emergency Services department on June 8, 2015. [Dr.] Parrillo described S.M.'s condition as a medical emergency. **CHOP indicated they would admit S.M., and connected [Dr.] Parrillo to CHOP's PICU.** [Dr.] Parrillo thereafter spoke with Dr. Taylor of CHOP's PICU. [Dr.] Parrillo provided the details of S.M.'s condition to Dr. Taylor. [Dr.] Parrillo stated he believed intubation would not be necessary, but informed Dr. Taylor that he could intubate S.M. if needed. **Dr. Taylor suggested [Dr.] Parrillo provide S.M. with saline, cefepime, and vancomycin**, and advised [Dr.] Parrillo that CHOP was sending a transport team to Einstein[.]

- 11 -

> When the CHOP Team arrived, Nurses Galvin and Maerten did not render medical treatment to S.M. **Nurse Galvin called CHOP and told them she was going to "get this kid intubated." Nurse Galvin then located [Dr.] Parrillo to initiate the intubation**, but no one from CHOP participated in the intubation attempts. When [Dr.] Parrillo's first two intubation attempts failed, the Einstein[] staff began CPR. Although **Nurse Galvin provided [Dr.] Parrillo with a King's Airway that the CHOP team brought,** CHOP did not participate in placing the King's Airway. When S.M.'s condition began to improve, Nurse Galvin left the area to update Dr. Taylor by phone. The nature of the relationship between CHOP and S.M. is not changed by [Appellants'] testimony that **Nurse Maerten took turns performing chest compressions on S.M.,** or that **Dr. Taylor provided recommendations to Nurse Galvin.**

*Id.* at 15-16.[7]

More importantly, Appellants offered expert testimony to support their assertion that CHOP, through the actions of Dr. Taylor, Nurse Galvin, and Nurse Maerten, did in fact undertake to provide medical care to S.M. For instance, Appellants' expert, Dr. Paynter, testified that Nurse Galvin was "calling the shots" and "taking the responsibility" when she called out orders to the Einstein staff. N.T., 2/13/20 (Afternoon Session), at 51. Dr. Paynter stated that Dr. Parrillo "may have been in charge, but the decision making, which is critical in a code, when to give a drug, when to take an action, was being called by Matt Taylor over the phone to Donna Galvin." *Id.* Further, when Dr. Parrillo twice unsuccessfully attempted to intubate S.M., Nurse Galvin "could have taken command and intubated the patient. That did not

---

[7] We have taken the liberty of correcting the spelling of Dr. Parrillo's name.

happen and instead a less qualified person who had only done five pediatric intubations attempted it. It did not work out." *Id.* at 26. The subsequent attempts by two different Einstein anesthesiologists "apparently did not work out either." *Id.* Moreover, Nurse Maerten was unquestionably participating in S.M.'s care when she engaged in CPR along with Einstein personnel.

Dr. Paynter also was critical of CHOP's failure to include a pediatric care intensivist fellow as part of the transport team. Notes of Testimony, 2/13/20, (Morning Session), at 96-97. An intensivist physician was "just what this child needed to get all these variables under control. And they did not make the decision to send that, and it's in their policy that they can send that person, and I can't imagine a sicker child than this one that would need it. The intensivist should have been sent in the ambulance[.]" *Id.*

Further evidence of CHOP's participation in S.M.'s care stems from Dr. Taylor's recognition that S.M. was septic, a diagnosis Dr. Parrillo seemingly missed, even when the x-ray he ordered revealed pneumonia, after he initially diagnosed S.M. with asthma (and ordered Albuterol) and then cancer. *See* Notes of Testimony, 2/11/20 (Morning Session), at 42-45, 107, 113-14. It was Dr. Taylor's recommendation to administer antibiotics and a saline bolus, reflecting his diagnosis of sepsis and his involvement in S.M.'s care.

At the least, Appellants presented expert testimony that suggested CHOP's actions, or lack thereof, increased the risk of harm to S.M.[8] As this Court recognized in **Hill v. Slippery Rock University**, 138 A.3d 673 (Pa. Super. 2016), *appeal denied*, 164 A.3d 491 (Pa. 2017):

> In Pennsylvania, an increased risk of harm can occur through a failure to act, or a "sin of omission." Indeed, in addressing increased risk of harm under Section 323 of the Restatement, the Pennsylvania Supreme Court stated as follows:
>
> > [O]nce a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.
>
> **Hamil v. Bashline**, 481 Pa. 256, 392 A.2d 1280, 1288 (1978) (footnote omitted) (emphasis added). Moreover, in **Hamil**, the Court noted the effect of Section 323(a) was to relax the degree of certainty ordinarily required of a plaintiff's evidence in order to make a case for the jury. **Id.**; **see also** [**Feeney v. Disston Manor Personal Care Home, Inc.**, 849 A.2d 590, 595 (Pa. Super. 2004) (applying the standard announced in **Hamil** to a motion to remove a compulsory nonsuit).

**Id.** at 680 (footnote omitted).

---

[8] Dr. Paynter testified that CHOP's failure to staff the transport team with an intensivist fellow increased the risk of harm to S.M. Notes of Testimony, 2/13/20 (Afternoon Session), at 4-5. Even prior to his testimony, the trial court stated, "I've concluded that it's quite likely that we are going to be reading the increased risk of harm instruction to the jury. . . . It's going to be for the jury to decide a great number of questions about the interaction between anybody from CHOP and the people who were at Einstein." Notes of Testimony, 2/13/20 (Morning Session), at 126-27.

As noted above, "entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving 'the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor.'" **Scampone**, 57 A.3d at 595-96 (quoting **Agnew v. Dupler**, 717 A.2d at 523).  Otherwise, the compulsory nonsuit is properly removed and the matter remanded for a new trial.  **Id.**

Giving Appellants the benefit of every reasonable inference, and resolving all evidentiary conflicts in their favor, we cannot say "that the factfinder could not reasonably conclude that the essential elements of the cause of action were established" or that "the lack of evidence to sustain the action [is] so clear that it admits no room for fair and reasonable disagreement." **Rolon**, 232 A.3d at 776-77.  Accordingly, we find the trial court erred in granting the nonsuit in favor of CHOP.  Therefore, we remand the case with direction that the nonsuit be removed and a new trial be granted.[9]

_____

[9] In light of our disposition of Appellants' challenge to the trial court's entry of a nonsuit, we need not address Appellants' second issue.  However, we recognize that our Supreme Court has held that while an **Althaus** analysis is necessary when courts announce a new common law duty, it is unnecessary when circumstances involve application of existing statutory and common law duties of care, such as those owed a plaintiff under the Restatement (Second) of Torts, § 323.  **See Feleccia v. Lackawanna Coll.**, 215 A.3d 3, 13-14 (Pa. 2019); **Scampone**, 169 A.3d at 617 (**Althaus** analysis is superfluous because Pennsylvania has adopted the Restatement (Second) of Torts, § 323).

Order reversed.  Case remanded for removal of nonsuit and a new trial.

Jurisdiction relinquished.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 10/27/2021*