J-A06026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| FREDDY MUNOZ AND BEATRIZ MUNOZ, AS CO-ADMINISTRATORS OF THE ESTATE OF SAMUEL F. MUNOZ | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| | : | No. 1388 EDA 2024 |
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA, EINSTEIN HEALTHCARE NETWORK, EINSTEIN PRACTICE PLAN, EARL M. BRYANT, D.O., STEVEN J. PARRILLO, D.O., VAISHALI NAIK, D.O., DMITRY ROBERMAN, D.O., EINSTEIN MEDICAL CENTER ANESTHESIOLOGY, MOSS REHAB/EINSTEIN AT ELKINS PARK | : : : : : : : : : : : : : : | |
| APPEAL OF: CHILDREN'S HOSPITAL OF PHILADELPHIA | : | |

Appeal from the Judgment Entered April 25, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  170403453

BEFORE:   PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MAY 27, 2025**

The Children's Hospital of Philadelphia ("CHOP") appeals from the

judgment entered by the Court of Common Pleas of Philadelphia County in the

amount of $11,595,157.67 in favor of Freddy and Beatriz Munoz, co-

administrators of the Estate of Samuel F. Munoz ("Appellees").  This Court

_____

[*] Former Justice specially assigned to the Superior Court.

previously granted CHOP a new trial on Appellees' claims of medical malpractice. *See Munoz v. Children's Hospital of Philadelphia* ("*Munoz I*")*,* 265 A.3d 801 (Pa.Super. 2021). After careful review, we affirm.

We summarize the factual background of this case as follows. On June 7, 2015, Freddy Munoz ("Mr. Munoz") took his four-year-old son, Samuel Munoz ("Decedent"), to Einstein Medical Center – Elkins Park ("Einstein-Elkins Park") to treat Decedent's high fever and swollen lip. Notes of Testimony (N.T.), 12/6/23, at 77-78.[1] Decedent was evaluated by Earl M. Bryant, D.O., who discharged Decedent in under an hour with a diagnosis of a herpes lesion. N.T., 12/4/23, at 224-226. Dr. Bryant directed Mr. Munoz to give Decedent Motrin and fluids while monitoring his fever. N.T., 12/6/23, at 78-79.

As Decedent's fever persisted and he became short of breath, Mr. Munoz brought Decedent back to Einstein-Elkins Park the following day on June 8, 2015. *Id.* at 79-80. Upon his arrival at approximately 4:33 p.m., Decedent was reported to have abnormal vital signs, including low oxygen levels, a high respiratory rate, a high heart rate, and a high fever. N.T., 12/5/23, at 8. Decedent was treated by Steven J. Parrillo, D.O, who initially believed Decedent was suffering from asthma or cancer, but eventually discovered Decedent had developed pneumonia after reviewing his x-ray results.[2] N.T.,

_____

[1] The Decedent had been previously treated for pneumonia six months earlier at the same facility. N.T., 12/4/23, at 223.

[2] While Dr. Parrillo reported that the Decedent had a low white blood cell count, both parties suggest that Dr. Parrillo interpreted that test result incorrectly. N.T., 12/5/23, at 23-24; N.T., 12/7/23, at 55.

12/6/23, at 81; N.T., 12/7/23, at 38. Given these diagnoses, Dr. Parrillo started Decedent first on an asthma medication and then eventually gave him an antibiotic, intravenous fluids, and a high flow oxygen mask. N.T., 12/7/23, at 47. Decedent responded to these treatments and his oxygen levels began to rise. N.T., 12/5/23, at 8-10.

Dr. Parrillo contacted CHOP to ask for assistance with Decedent's care, which Dr. Parrillo characterized as an emergency. N.T., 12/7/23, at 38. Dr. Parrillo was referred to CHOP's pediatric intensive care unit ("PICU") at 5:24 p.m. and spoke with Matthew Taylor, M.D., a pediatric intensive care fellow, who was also serving as the medical command physician ("MCP") of the CHOP PICU. N.T., 12/7/23, at 29-30, 38. After being informed of Decedent's symptoms and test results, Dr. Taylor agreed Decedent had pneumonia but directed Dr. Parrillo to change the antibiotic given, add an additional antibiotic and antiviral medication, and administer saline. *Id.* at 56; N.T., 12/6/23, at 173, CHOP Audio Recording, 6/8/15, at 16-20.[3] As Dr. Taylor agreed Decedent needed advanced care and hospitalization, a patient chart was started for Decedent within the CHOP PICU. N.T., 12/6/23, at 75.[4]

_____

[3] All calls to CHOP related to Decedent's care were recorded and transcripts of these conversations were presented as exhibits at trial.

[4] At the time of the relevant events, Einstein-Elkins Park maintained a satellite emergency room that was only capable of admitting adult patients as it did not have a pediatrics department. Parrillo Dep., 11/29/23, at 21-22. When Dr. Parrillo determined that Decedent needed to be hospitalized, he first sought to transfer Decedent to Abington Hospital, which declined to take Decedent as they believed he was too sick. Trial Exhibit, Einstein-Elkins Park ED Nursing Record, at 9; Parrillo Dep., 11/29/23, at 110.

Dr. Parrillo requested that CHOP transport Decedent to its facility for continued care, as Einstein-Elkins Park did not have a transport team. N.T., 12/7/23, at 46. Given that Decedent needed oxygen supplementation as a result of his pneumonia, Dr. Taylor specifically asked Dr. Parrillo whether he believed Decedent could "crash" and require intubation as additional breathing support. N.T., 12/7/23, at 44. Dr. Parrillo indicated that he did not think that Decedent would need to be intubated and that if he did, Dr. Parrillo could handle the intubation. *Id.*; CHOP Audio Recording, 6/8/15, at 18.

Thereafter, at 5:41 p.m., CHOP informed Dr. Parrillo that it had an available critical care transport team, which would arrive at Einstein-Elkins Park in approximately one hour. *Id.* at 58-60. The transport team consisted of Heather Maerten, a registered nurse, and Donna Galvin Hill, a prehospital registered nurse, who was trained to perform emergency pediatric intubations under the supervision of a physician. N.T., 12/6/23, at 144, 167. The critical care team did not include any intensivist or any other doctor.

While the CHOP critical care team was traveling to Einstein-Elkins Park, Decedent's condition deteriorated rapidly. Upon the arrival of the CHOP team at Einstein-Elkins Park at approximately 6:35 p.m., Nurse Galvin Hill spoke to the Einstein nursing staff while Nurse Maerten entered Decedent's room and observed Decedent had turned "blue" from decreased oxygen levels. N.T., 12/6/23, at 88-89; N.T., 12/7/23, at 34, 91; N.T., 12/8/23, at 42-45. Nurse Maerten alerted the Einstein staff while Nurse Galvin Hill reported back to

CHOP that she "might have to tube this kid." N.T., 12/8/23, at 46; CHOP Audio Recording, at 35.

Thereafter, the CHOP nurses deferred to Dr. Parrillo who administered Decedent an intubation sedative and paralytic and attempted to intubate him at 6:52 p.m. N.T., 12/8/25, at 46. This attempt was unsuccessful and Dr. Parrillo noted a significant reflux of blood from Decedent's nose, tube, and mouth. Einstein-Elkins Park ED Nursing Record ("Nursing Record"), 6/8/15, at 9; Parrillo Dep., 11/29/23, at 62-63. Dr. Parrillo made a second intubation attempt, which similarly failed. Nursing Record, at 9. Dr. Parrillo attempted to ventilate Decedent with an Ambu bag and mask. *Id.*

At 6:56 p.m., Decedent went into cardiac arrest and Einstein providers began cardiopulmonary resuscitation (CPR). *Id.* The CHOP nurses had not participated in the intubation attempts, but subsequently offered Dr. Parrillo a King's Airway device (alternative to intubation), which Dr. Parrillo successfully placed at 6:59 p.m. *Id.* After the placement of the King's Airway device, Decedent's pulse returned at 7:03 p.m. and his oxygen levels began to rise, allowing the discontinuance of CPR. *Id.* Nurse Galvin Hill continued to converse with Dr. Taylor by phone, giving him updates on Decedent's condition and communicating Dr. Taylor's recommendations to Dr. Parrillo. N.T., 12/7/23, at 60-62.

However, at 7:08 p.m., Decedent again entered cardiac arrest and CPR was resumed in which Nurse Maerten participated by giving chest compressions. N.T., 12/8/23, at 49-50; Nursing Record, at 9. Two Einstein

anesthesiologists, Dr. Vaishali Naik, D.O. and Dr. Dmitry Roberman, D.O., arrived and were able to place the endotracheal tube, but this action did not ultimately help to resuscitate Decedent. N.T., 12/8/23, at 118; Parrillo Dep., 11/29/23, at 80-82. Decedent received additional rounds of CPR, but did not exhibit signs of improvement. Einstein-Elkins Park ED Physician Record ("Physician Record"), 6/8/15, at 9. Dr. Parrillo pronounced Decedent's time of death to be 7:36 p.m. Physician Record, at 13. Decedent was never moved to an ambulance or transported to CHOP.[5]

Appellees filed their initial complaint against Einstein-Elkins Park, Dr. Parrillo, and other Einstein physicians and entities (collectively "Einstein defendants") in the Montgomery County Court of Common Pleas in early 2016. Appellees subsequently discontinued that action in order to refile this action in Philadelphia County with the addition of CHOP as a defendant. Appellees filed their complaint and certificates of merit in this action on May 24, 2017, which included wrongful death and survival claims against all defendants.

With respect to CHOP, Appellees argued that CHOP was responsible for the acts and omissions of its agents who "knew or should have known of [Decedent's] critical illness, need for immediate return to CHOP's PICU for high level management, as well as his high likelihood of suffering further

_____

[5] During these events, Nurse Galvin Hill continued to update Dr. Taylor, who attempted to arrange the dispatch of a second critical care team from CHOP that included a pediatric specialist. However, a second team was not dispatched as Einstein personnel determined it could not arrive in time to assist in Decedent's care. CHOP Audio Recording, 6/8/15, at 65-68.

respiratory distress and requirement for highly specialized pediatric intensivist care unavailable at Einstein Elkins Park." Complaint, 5/24/17, at 11. Appellees alleged that CHOP personnel were negligent in dispatching a critical care team that did not include a PICU physician, which "removed any chance of [Decedent] getting the benefit of CHOP's pediatric expertise in intubating children such as [Decedent]." Complaint, at 8.

The parties proceeded to a jury trial before the Honorable Ann Butchart on February 10, 2020. At the close of the presentation of Appellees' evidence, CHOP moved for a compulsory nonsuit arguing that Appellees had failed to establish a corporate liability claim against CHOP. In addition, CHOP argued that Appellees' claims were preempted by the federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. In response, Appellees asserted that they had presented expert testimony to support a theory of CHOP's vicarious liability for the negligence of its agents. Further, Appellees argued that EMTALA did not preempt their claims. On February 18, 2020, Judge Butchart granted CHOP's motion for a compulsory nonsuit.

On February 21, 2020, Appellees entered a settlement agreement with the Einstein defendants, which the trial court eventually approved on May 15, 2020. In the meantime, Appellees filed a post-trial motion arguing that the trial court erred in granting a nonsuit in favor of CHOP. Judge Butchart denied the post-trial motion, finding Appellees failed to provide a basis to warrant imposing a duty upon CHOP to care for Decedent as CHOP "did not undertake to provide medical services to [Decedent,]" never transported Decedent, and

did not have any relationship to Decedent. Trial Court Opinion (T.C.O.), 12/18/20, at 19. The trial court did not address whether EMTALA preempted Appellees' claims.

On appeal, on October 27, 2021, this Court reversed the trial court's entry of nonsuit and remanded for a new trial against CHOP, finding "ample evidence to demonstrate that CHOP undertook and provided health care services to [Decedent]" through the actions of its agents. *Munoz I*, 265 A.3d at 803. This Court noted that Appellees presented expert testimony demonstrating that CHOP's agents' "actions, or lack thereof, increased the risk of harm to [Decedent]." *Id.* at 808-809. As such, when viewing the record in the light most favorable to Appellees, this Court indicated that it was unable to determine that "the factfinder could not reasonably conclude that the essential elements of the cause of action were established." *Id.* at 809. Further, this Court found Appellees' claims were not preempted by EMTALA. *Id.* at 806 n.6. Thereafter, CHOP filed a petition for allowance of appeal, which our Supreme Court denied on August 16, 2022.

On December 4, 2023, the parties proceeded to a new jury trial before the Honorable Glynnis Hill. Both Appellees testified on their own behalf and offered expert testimony addressing both the treatment provided to Decedent by Einstein personnel as well as the involvement of CHOP's personnel in Decedent's care. Appellees presented the testimony of Dr. Wayne Ross, forensic pathologist, who opined Decedent's cause of death was cardiorespiratory failure as a result of hypoxic ischemic encephalopathy (brain

damage due to lack of oxygen) which was caused by the intubation failures. N.T., 12/4/23, at 135, 153-157. Dr. Ross further opined that Dr. Parrillo had performed traumatic intubations by inadvertently placing the endotracheal tube in Decedent's esophagus instead of his trachea, which caused the air to go into Decedent's stomach instead of his lungs and also caused bleeding into Decedent's tube, mouth, and nose. *Id.* at 153, 163-66, 181-82.

Appellees offered the testimony of Dr. Jennifer Lighter, M.D.,[6] a pediatric infectious disease physician, who criticized Dr. Parrillo for not recognizing Decedent was experiencing sepsis or systemic immune response syndrome (SIRS).[7] *Id.* at 213, 217-18, 228-230, 234-36. Dr. Lighter emphasized that Decedent only received the needed medication and fluids to treat SIRS after Dr. Taylor recognized Decedent was septic and directed Dr. Parrillo to give him different antibiotics and additional fluids. N.T., 12/5/23, at 12-14. Dr. Lighter also opined that if Decedent had been promptly intubated, he could have survived. N.T., 12/4/23, at 232-33.

Appellees' theory of liability against CHOP focused on the testimony of Dr. Ronald Paynter, M.D., an expert in emergency medicine and the administrative components of transport, who asserted that CHOP became

---

[6] Dr. Lighter's testimony from the first trial was read to the jury.

[7] Sepsis or SIRS is an inflammatory response that can result after bacteria from a patient's pneumonia or other condition enters a patient's blood and can eventually lead to organ failure. N.T. 12/4/23, at 213, 217-18. Experts from both parties agreed that Decedent was experiencing sepsis. N.T. 12/4/23, at 217-218, 230-34; N.T. 12/5/23, at 14, 38, 129; N.T. 12/7/23, at 129-32.

involved in Decedent's care when its personnel agreed to assist Einstein-Elkins Park and transport Decedent for advanced care in their facility, started a chart for Decedent in their PICU, and modified his treatments.  N.T., 12/5/23, at 72-73, 113-115.

Dr. Paynter opined that CHOP and Dr. Taylor deviated from their standard of care and their own policy in failing to send a physician on the transport team, despite having a pediatric intensivist available, to ensure a successful intubation of a critically ill child in a "very, very dangerous situation."  *Id.* at 85-86.  Dr. Paynter pointed to CHOP internal policy which suggested that CHOP should include an internist or physician on a transport team if the patient was unstable or had the potential to become unstable during transport.[8]  *Id.* at 70.  Dr. Paynter asserted that CHOP was on notice that they were responsible to provide care for Decedent, a child in "severe respiratory distress" who had unstable vital signs or had the potential to lose stable vital signs given his high heart rate, high respiratory rate, and very high fever.  *Id.* at 70-77, 87-88.

Dr. Paynter indicated that CHOP's decision to send a transport team without a specialist physician left Decedent in the care of Dr. Parrillo, who

_____

[8] CHOP's policy entitled "Guidelines for Delegation of Transports and Appropriate Team Composition," which included examples of transport team compositions, suggested that a team could include a fellow and a registered nurse if the patient exhibited "unstable vital signs and potential for loss of vital signs on transport."  N.T. 12/5/23, at 80; Exhibit P-74.1.  The CHOP policy indicated that "decisions on team composition and mode need to made after full triage and discussion with the MCP [(medical command physician)].  Exhibit P-74.1.

admittedly had "very limited" experience in pediatric intubation and who was ultimately unable to perform the intubation.[9] *Id.* at 71, 90. Dr. Paynter emphasized that Dr. Parrillo was not a pediatrician and was calling CHOP to request its assistance and expertise. *Id.* at 87-88.

Further, Dr. Paynter faulted CHOP Nurse Galvin Hill for not participating in the intubation attempts despite her experience and skill in pediatric intubation. *Id.* at 89-91.[10] Appellees also offered the expert testimony of Nurse Megan Jolin, pediatric nurse practitioner, who agreed that the CHOP nurses violated a standard of care in failing to actively participate in the initial intubation process when they arrived at Einstein-Elkins Park. N.T., 12/6/23, at 134; Videotaped trial depo. Megan Jolin, 10/4/23, at 7, 27, 60-61.

Lastly, Appellees offered the expert testimony of David Hopkins, an actuarial economic consultant, to offer a projection of Decedent's lost earning capacity and life expectancy losses. N.T., 12/6/23, at 4, 8. At the close of Appellees' case-in-chief, CHOP again moved for a compulsory nonsuit, which Judge Hill denied.

---

[9] Dr. Parrillo admitted that he had intubated "only a few" children over his entire career, estimating he had performed over 100 adult intubations but only five pediatric intubations. N.T. 12/6/23, at 71, 123; Parrillo Dep. 11/29/23, at 18-19. At the time he treated Decedent, Dr. Parrillo had practiced emergency medicine for over thirty-five years. Parrillo Dep. 11/29/23, at 11, 18-19.

[10] Nurse Galvin Hill indicated that she had intubated at least thirty children under the supervision of a physician in previous three years. Galvin Hill Dep., 2/27/19, at 32-35.

In its defense, CHOP presented live or recorded testimony from Dr. Parrillo, Dr. Taylor, Nurse Galvin Hill, Nurse Maerten, Dr. Roberman, Dr. Naik, Dr. Justin Lockman, M.D., the attending physician in the CHOP PICU when Einstein-Elkins Park requested assistance in Decedent's care, and Monica Kleinman, M.D., an expert in the field of pediatric critical care and transport.

Both Dr. Lockman and Dr. Kleinman opined that Dr. Taylor should not have staffed the critical care transport team with a physician as Decedent did not exhibit signs of instability or the risk of the failure of his vital signs at the time that Dr. Parrillo requested the transport team. N.T., 12/6/23, at 150-62; N.T., 12/7/23, at 52-54, 128-144. Dr. Taylor, Dr. Lockman, and Dr. Kleinman asserted that Decedent had exhibited abnormal, not unstable, vital signs upon his arrival to Einstein-Elkins Park and responded to medical interventions that Einstein staff implemented before the CHOP transfer team arrived. *Id.* Moreover, Dr. Lockman, and Dr. Kleinman asserted that it was appropriate for Nurse Galvin Hill to defer to Dr. Parrillo and Einstein staff to make the intubation attempts instead of taking charge and intubating Decedent herself. N.T., 12/6/23, at 167-170; N.T., 12/7/23, at 91, 145-49.

At the conclusion of the trial on December 11, 2023, the jury entered a $14,000,000.00 verdict in favor of Appellees. As the jury found the negligence of both CHOP and the Einstein defendants caused Appellees harm and apportioned 67% of the liability to CHOP, the verdict against CHOP was reduced to $9,380,000.00 to reflect that apportionment of liability.

On December 12, 2023, Appellees filed a motion for delay damages. On December 21, 2023, CHOP filed post-trial motions seeking judgment notwithstanding the verdict (JNOV), a new trial, and/or remittitur. On April 18, 2024, the trial court denied CHOP's post-trial motions and molded the verdict to add delay damages of $2,215,157.67. On April 25, 2024, Appellees filed a praecipe for the entry of judgment.

CHOP filed a timely appeal and complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). CHOP raises the following issues for our review on appeal:

1. Whether the trial court erred in denying CHOP's request for JNOV where [Appellees] failed to prove that one or more CHOP employees owed [the decedent] a legal duty that was breached that, in turn, caused [the decedent] harm, and, thus, failed to establish a basis upon which CHOP could be held vicariously liable?

2. Whether the trial court erred in denying CHOP's request for JNOV where a federal statute, the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(f), preempts any state law duties that conflict with the duties the statute imposes, which inexorably placed the duty to stabilize the patient exclusively on Einstein, the sending hospital, prior to transport?

3. Whether the trial court abused its discretion in failing to grant JNOV on [Appellees'] Wrongful Death claim where [Appellees] presented no evidence about pecuniary losses or specific loss of services, and grief and/or loss of society and companionship of a child are not recoverable in a wrongful death case in Pennsylvania?

4. Whether the trial court abused its discretion in failing CHOP's new trial request where the overwhelming weight of the evidence established that no CHOP agent or employee owed a duty that was breached and caused [Appellees'] harm.

- 13 -

CHOP's brief, at 18-19.

The majority of CHOP's claims on appeal challenge the trial court's denial

of its request for JNOV. We are guided by the following principles:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the trial court could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

***Coryell v. Morris***, 330 A.3d 1270, 1277–78 (Pa.Super. 2025) (citation

omitted).

To successfully prove a claim of medical malpractice, "a plaintiff must

plead and prove four elements of negligence: a duty of care to the patient; a

breach of that duty; the breach was a proximate cause or substantial factor

in bringing about harm to the patient; and the damages were a direct result

of the harm." ***Kunkel v. Abington Mem'l Hosp.***, 328 A.3d 1150, 1156

(Pa.Super. 2024) (quoting ***Corrado v. Thomas Jefferson Univ. Hosp.***, 790

A.2d 1022, 1030 (Pa.Super. 2001))

More specifically, "[d]etermining whether there was a breach of duty in a professional malpractice action entails two steps: first, a determination of the relevant standard of care, and second, a determination of whether the defendant's conduct met that standard." *Mazzie v. Lehigh Valley Hosp. - Muhlenberg*, 257 A.3d 80, 87 (Pa.Super. 2021) (citing *Toogood v. Rogal*, 573 Pa. 245, 824 A.2d 1140 (2003)). To establish the causation element in a professional malpractice action, "the plaintiff must show that the defendant's failure to exercise the proper standard of care caused the plaintiff's injury." *Mazzie*, 257 A.3d at 87 (quoting *Freed v. Geisinger Medical Center*, 910 A.2d 68, 72 (Pa.Super. 2006)).

As a general rule, "expert testimony is required in a medical malpractice action to establish several elements, including the proper standard of care, the defendant's failure to exercise that standard of care, and the causal relationship between the failure to exercise the standard of care and the plaintiff's injury." *Freed*, 910 A.2d at 72-73. Further, "a medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." *Munoz I*, 265 A.3d at 806 (citation omitted).

Within its brief, CHOP claims the trial court erred in refusing to grant JNOV with respect to the elements of the negligence action as Appellees failed to establish that (1) CHOP could be held vicariously liable, (2) CHOP owed a

duty to Decedent as the transferring hospital, or (3) CHOP employees were negligent with regard to the affirmative acts that they performed.[11]

As a preliminary matter, we must determine whether CHOP properly preserved its challenges seeking JNOV before the trial court. "[A] ground may not serve as the basis for post-trial relief, including a judgment n.o.v., unless it was raised in pre-trial proceedings or at trial." *Straub v. Cherne Indus.*, 583 Pa. 608, 615, 880 A.2d 561, 566 (2005) (citing Pa.R.C.P. 227.1(b)). "A party moving for JNOV must have preserved during trial the claim on which it predicates its JNOV motion." *Kimble v. Laser Spine Inst., LLC*, 264 A.3d 782, 792 (Pa.Super. 2021) (*en banc*) (citing Pa.R.C.P. 227.1(b)).

"[T]o preserve the right to request a JNOV post-trial, a litigant must first request a binding charge to the jury or move for a directed verdict or a compulsory non-suit at trial. Failure to do so may result in waiver."[12] *Mazzie*,

---

[11] CHOP claims for the the first time on appeal that it was entitled to JNOV as two of Appellees' experts, Dr. Paynter and Nurse Jolin, were not qualified to evaluate Dr. Taylor's standard of care as neither expert satisfied the same-specialty requirement in Section 512(c)(2) of the Medical Care Availability and Reduction of Error (MCARE) Act. *See* 40 P.S. § 1303.512(c). As CHOP failed to identify any point in the record where it made an objection on this basis, this claim is waived. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"). Further, as CHOP did not raise any challenges to Dr. Paynter and Nurse Jolin's testimony in its Rule 1925(b) statement, the trial court did not address these arguments. *See Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (issues not raised in a court-ordered Rule 1925(b) statement are waived).

[12] We note that "[a] motion for compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence" and is made at the close of the plaintiff's case." *Rogers v. Thomas*, 291 A.3d 865, 882–83 (Pa.Super. 2023)
*(Footnote Continued Next Page)*

257 A.3d at 87 (quoting **Phelps v. Caperoon**, 190 A.3d 1230, 1247 (Pa.Super. 2018)).  The approach of requiring a litigant to preserve grounds for JNOV in a directed verdict, compulsory nonsuit, or binding jury charge has the "salutary effect of submitting the issue to the trial judge for initial evaluation during trial, when the proofs are still fresh." **Corvin v. Tihansky**, 184 A.3d 986, 990 (Pa.Super. 2018) (citation omitted).

Our review of the record reveals that CHOP did move for a compulsory nonsuit at the end of Appellees' case-in-chief in its second trial, but raised the limited claim that Appellees failed to demonstrate CHOP owed a duty of care to Decedent. CHOP did not request that the trial court enter a directed verdict in its favor at the conclusion of the trial.  CHOP does not assert that it submitted a proposed point for a binding instruction on any of the particular grounds for which it seeks JNOV. As CHOP did not preserve its claims that Appellees failed to establish a claim of vicarious liability or a basis to find CHOP's agents were negligent, we will not address either issue further.[13]

_____

(quoting **Atlantic Richfield Co. v. Razumic**, 480 Pa. 366, 390 A. 2d 736, 744 (1978)). In contrast, "[a] motion for directed verdict, like a motion seeking judgment notwithstanding the verdict ("JNOV"), requires a court to test the sufficiency of all evidence at the close of a case." **Rogers**, 291 A.3d at 882–83 (citing **Reading Radio, Inc. v. Fink**, 833 A.2d 199, 210 (Pa.Super. 2003)).

[13] We decline CHOP's request to overlook these grounds for waiver simply because the trial court's opinion pursuant to Pa.R.A.P. 1925(a) addresses CHOP's claim that Appellees failed to prove CHOP's vicarious liability.  Rule 227.1 codified the Supreme Court's rule in **Commonwealth v. Dilliplaine**, 457 Pa. 255, 322 A.2d 114 (1974), which requires litigants to make a "timely specific objection" to preserve allegations of trial error in order to allow the
*(Footnote Continued Next Page)*

As such, the sole claim on which CHOP preserved the right to request JNOV was its contention that Appellees failed to show CHOP owed Decedent a duty of care. In this case, the trial court determined that there was sufficient evidence for the jury to conclude that CHOP personnel owed a duty to Decedent as they had undertaken and provided Decedent medical services pursuant to the Restatement (Second) of Torts, § 323, which provides that:

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts, § 323.

In requesting JNOV before the trial court, CHOP limited its claim to argue that Appellees failed to show CHOP owed a duty of care to Decedent because it had never assumed care of Decedent before his death as Decedent was never placed in CHOP's ambulance. CHOP asserted that it did not establish a physician/patient relationship with Decedent simply by agreeing to transport

---

trial court an opportunity to correct error and "advance[] the orderly and efficient use of our judicial resources." *Id.* at 258-59, 322 A.2d at 116. Our courts have emphasized a "trial court may not eliminate the entire purpose of making a record and invalidate the directive in *Dilliplaine* simply by addressing an issue" and the appellate court need not blindly defer to a trial court that does so." *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 573 (Pa.Super. 2006) (quoting *Takes v. Metro. Edison Co*., 548 Pa. 92, 100, 695 A.2d 397, 401 (1997)).

Decedent to CHOP. CHOP contended that its personnel did not assume care of Decedent when they arrived at Einstein-Elkins Park as Dr. Parrillo and the Einstein providers "had sole *legal* responsibility and the physician/patient relationship to manage the care of [Decedent] to intubate and resuscitate him." N.T., 12/6/23, at 119 (emphasis added).

On appeal, CHOP expands this argument to that Appellees never articulated a basis to impose a "*legal* duty that required Dr. Taylor to include a doctor on the transport team." CHOP's brief, at 28 (emphasis in original). CHOP contends that "neither CHOP nor any CHOP employees had any duty to stabilize [Decedent], and therefore, there was no duty to send a physician for that purpose, i.e., to establish, rather than to ensure the child's stability during transport back to CHOP." CHOP's brief, at 29.

To evaluate CHOP's arguments, it is essential to distinguish the duty of care requirement from analysis of the appropriate standard of care. "[I]n a cognizable medical malpractice claim, the defendant-physician must owe the patient a duty of care." ***Winschel v. Jain***, 925 A.2d 782, 796 (Pa.Super. 2007). The question of whether a duty exists in a particular set of circumstances is a pure question of law that is to be decided by the trial court without jury consideration. ***K.H. ex rel. H.S. v. Kumar***, 122 A.3d 1080, 1097 (Pa.Super. 2015). In contrast, the tasks of establishing the applicable standard of care and evaluating the defendant's satisfaction of that standard are questions of fact to be submitted to a jury that require expert testimony. ***Id.*** As noted above, an evaluation of the standard of care and the question

of whether the defendant failed to meet that standard of care are components of the analysis of whether there was a *breach* of the physician's duty to his or her patient. *Mazzie*, 257 A.3d at 87.

In *K.H.*, this Court emphasized the importance of maintaining the distinction between the duty and breach elements in a medical malpractice action. In that case, the appellants brought numerous claims of negligence against various physicians and hospital entities including allegations that several of the doctors had failed to report to governmental authorities their reasonable suspicions that a child patient was a victim of physical abuse. *K.H.*, 122 A.3d at 1088. The trial court granted the physicians and hospital entities partial summary judgment based on its finding that it found no express common-law duty on the part of a physician to discover and report a case of possible child abuse. *Id.* at 1089-90.

On appeal, this Court reversed the trial court's decision, finding the trial court had improperly imported questions of whether a duty was *breached* into its evaluation of whether a duty of care existed in the first instance. *Id.* at 1095. While acknowledging that Pennsylvania precedent is "not a paragon of clarity in distinguishing duty from standard of care," this Court stressed that "a physician's duty to a patient is simply the 'exercise [of] reasonable medical care,' without importing into that question of duty the precise contours of what care was appropriate under the circumstances of that case." *Id.* at 1096. (citing *Pratt v. Stein,* 444 A.2d 674 (Pa.Super. 1982)). This Court clarified that a trial court must evaluate the physician's *general* duty to his patient to

provide reasonable medical care, which "*arises simply from the inception of any physician-patient relationship*." **Id.** at 1097 (emphasis added). Thereafter, the jury must evaluate how that "duty is to be fulfilled in a given case, which concerns the particular standard of care." **Id.**

As a result, this Court found that the trial court in K.H. had conflated the appellee physicians' general duties of reasonable care with the specific standard of care, which was a question reserved for the jury. **Id.** This Court found that the appellants had established the appellee physicians' general duty "as soon as they established the undisputed physician-patient relationship between K.H. [and all the appellee physicians] in this case." **Id.**

The recognition of a physician's general duty to provide reasonable care was also discussed in *Seebold v. Prison Health Servs., Inc.,* 618 Pa. 632, 57 A.3d 1232, 1244–45 (2012), in which our Supreme Court recognized a limited duty of a physician to third parties in the treatment of a patient's communicable disease. The relevant principle of law guiding the duty analysis in that case was found in Section 324(A) of the Second Restatement of Torts, which provides that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person ..., is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care...." Restatement (Second) of Torts § 324A. The Supreme Court found that the "original undertaking" described in this provision was "the entry into the physician-patient relationship for treatment purposes," which imposed upon

the physician "the duty to exercise reasonable care." **Seebold**, 618 Pa. at 652, 57 A.3d 1244–45.

Based on these principles, we find that CHOP has conflated its duty to care for Decedent with the application of the relevant standard of care. We reject CHOP's assertion that it did not owe any duty of care to Decedent based on its allegation that its "undertaking to render services" was limited to its agreement to transport Decedent to CHOP for advanced care. Rather, there is ample evidence to support the trial court's finding that CHOP entered a physician-patient relationship with Decedent for treatment purposes, which then imposed a duty on CHOP to proceed with reasonable care.

Dr. Paynter, Appellees' expert in emergency medicine and the administrative components of transport, testified that Dr. Parrillo's call to CHOP seeking assistance in Decedent's care was "the beginning of the patient/doctor relationship" as CHOP personnel began to define the care that Decedent would be given and directed Einstein staff how to implement a higher level of treatment. N.T., 12/5/23, at 49, 72, 114-15. Dr. Paynter noted that CHOP personnel became involved with Decedent's care before their transport team was dispatched to Einstein-Elkins Park as medical command physician Dr. Taylor agreed to admit Decedent into the CHOP PICU, started a chart for Decedent, and modified the treatments given by Einstein personnel by directing Dr. Parrillo to add different antibiotics and IV fluid. **Id.** at 72-76, 114. CHOP's own physician, Dr. Taylor, admitted that CHOP was involved in

Decedent's care from the first call for assistance from Einstein doctors. N.T., 12/7/23, at 84-85.

CHOP personnel actively participated in Decedent's care before its transport team arrived at Einstein-Elkins Park as Dr. Taylor immediately addressed signs and symptoms that Decedent was suffering from sepsis (now called systemic immune response syndrome or SIRS), a diagnosis which Dr. Parrillo seemingly missed. As noted above, Dr. Parrillo had initially diagnosed Decedent with asthma, cancer, and ultimately pneumonia after viewing his x-ray results, but never realized Decedent was septic. Upon hearing Decedent's symptoms and test results over the phone, Dr. Taylor recommendation of a different antibiotic regimen and a saline bolus reflected his diagnosis that Decedent's pneumonia had progressed into sepsis.

CHOP personnel continued to render services to Decedent upon the arrival of the CHOP critical care team at Einstein-Elkins Park. When Nurse Galvin Hill discovered that Decedent's condition was deteriorating rapidly, Nurse Galvin Hill reported back to CHOP that she was going to "have to tube this kid." The CHOP nurses alerted Dr. Parrillo and Einstein staff to initiate the intubation process. After Dr. Parrillo's first two attempts to intubate Decedent failed, Nurse Galvin Hill provided Dr. Parrillo with a King's Airway, an alternative airway device, that was successfully placed and led to an increase in Decedent's oxygen levels. Once Decedent went into cardiac arrest, Nurse Maerten actively participated in CPR by providing Decedent with chest compressions. During the time period in which Einstein personnel were

attempting to intubate Decedent and administering CPR, Nurse Galvin Hill was updating Dr. Taylor on the phone and communicating Dr. Taylor's recommendations to Dr. Parrillo.

Viewing the evidence in the light most favorable to Appellees as verdict winner, we conclude there was ample evidence to allow the jury to conclude that CHOP personnel undertook and provided healthcare services to Decedent and thus owed a duty to Decedent to exercise reasonable medical care.[14]

We recognize that CHOP also argues on appeal that the trial court should have found as a matter of law that CHOP personnel neither had a duty to send a physician on the critical care transport team nor any duty to intubate or stabilize Decedent. However, such arguments do not involve an inquiry into CHOP's legal duty but rather asks this Court to define the precise contours of what care was appropriate under the circumstances of this case, i.e., the factual issue of whether CHOP personnel *breached* the applicable standard of care as established by expert testimony.

As noted above, CHOP never claimed in a motion for compulsory nonsuit or in a motion for a directed verdict that Appellees had not presented sufficient

_____

[14] This conclusion is consistent with this Court's prior decision reversing the compulsory nonsuit entered in favor of CHOP and finding Appellees had presented sufficient evidence to allow a jury to find that CHOP undertook and provided medical services to Decedent. This Court similarly highlighted that CHOP personnel agreed to admit Decedent into their ICU, created a chart for him, modified the antibiotic and fluid regimen given to Decedent by Einstein, and actively participated in the attempts of Einstein personnel to intubate and resuscitate Decedent with CPR. ***See Munoz I***, 265 A.3d at 803. The majority of the evidence presented at the parties' first trial was again presented at the second trial.

evidence to allow the jury to make a factual finding that CHOP personnel failed to satisfy an applicable standard of care, but instead solely asked the trial court to find that CHOP had no duty as a matter of law to assume *any* care of Decedent, who was solely the patient of Einstein staff. It was only after the jury entered its verdict that CHOP requested JNOV in its post-trial motion on issues other than its claim that it owed no duty to provide Decedent medical services. As CHOP failed to preserve this specific challenge before the trial court during trial, it was not entitled to seek JNOV on this basis in its post-trial motion or on appeal. **Straub**, **supra**. Thus, we decline to review this issue further.

Second, CHOP contends that it was entitled to JNOV as a matter of law pursuant to the provisions of the federal EMTALA statute. As noted above, the sole claim on which CHOP preserved the right to request JNOV was its contention that Appellees failed to show that CHOP owed Decedent a duty of care. As noted above, CHOP did not properly preserve its argument that Appellees' claims were barred as matter of law pursuant to the federal EMTALA statute as it did not raise this issue in its motion for compulsory nonsuit and did not move for a direct verdict or request a binding jury charge on this issue.

Even assuming that this issue had been properly preserved for appeal, this Court previously rejected CHOP's argument that Appellees' negligence claims were barred as matter of law by EMTALA, a federal statute that requires a transferring hospital to stabilize a patient before transferring the patient to another hospital. **Munoz I**, 265 A.3d at 807 n.6; 42 U.S.C. § 1395dd(b).

This Court found persuasive the decision of the United States Court of Appeals for the Eleventh Circuit which held that "EMTALA was not intended to establish guidelines for patient care, [to] replace available state remedies, or to provide a federal remedy for medical negligence." **Munoz I**, 265 A.3d at 807 n.6 (quoting **Harry v. Merchant**, 291 F.3d 767, 773 (11th Cir. 2002)).[15] This Court also noted that the text of the EMTALA statute also expressly states that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

Although this Court recognized that Decedent never left the Einstein-Elkins Park facility, it emphasized that the key issue in this case was whether Appellees could establish that CHOP personnel owed a duty of care to Decedent pursuant to Section 323 of the Second Restatement of Torts by undertaking to provide Decedent medical services.

This Court's prior conclusion that Appellees' claims against CHOP were not preempted by EMTALA is the law of case. The law-of-the-case doctrine "refers to a family of rules which embody the concept that a court involved in

_____

[15] The Eleventh Circuit found that the "legislative history of EMTALA indicates it was intended to present 'patient dumping,' the practice of some hospital emergency rooms turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment." **Harry**, 391 F.3d at 772 (citing H.R.Rep. No. 99-241, pt. 3, at 5 (1986), _reprinted in_ 1986 U.S.C.C.A.N. 726, 726-727) (other citations omitted)). The Eleventh Circuit enacted EMTALA "to guarantee patient entry into the medical system via mandatory appropriate medical screenings and stabilization prior to transfer." **Harry**, 391 F.3d at 773.

the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *In re Koepfinger*, 302 A.3d 630, 639 (Pa. 2023) (quoting *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995)) (emphasis removed). Thus, we decline to review this issue further.

Third, CHOP claims the trial court should have granted JNOV on the damages award as Appellees (1) did not provide support of any economic loss they suffered as a result of Decedent's death and (2) improperly sought noneconomic damages for the loss of the "society and companionship" of their son, which CHOP alleges were not recoverable in a wrongful death action. We reiterate that CHOP did not raise either of these arguments for the trial court's consideration in a directed verdict, compulsory nonsuit, or a binding charge. As such, these claims were not preserved for appeal.

In addition, with respect to CHOP's claim that the trial court improperly allowed the jury to award Appellees non-economic damages for the loss of "society and companionship" of their son, the record shows that CHOP's counsel admitted at trial that the jury was permitted to award such damages. In fact, CHOP's own proposed points for charge asked that the trial court instruct the jury that Appellees were entitled to compensation "for losing [Decedent's] companionship, cooperation, affection, services, and assistance," wherein the "the term 'services' includes the emotional and psychological loss suffered a result of the death of [Decedent]." CHOP Points

for Charge, ¶ 14. Thus, CHOP waived any right to claim on appeal that such damages were impermissible.

Lastly, CHOP also argues that the jury's verdict was against the weight of the evidence. CHOP specifically argues that the "overwhelming weight of the evidence did not support the liability verdict" for multiple reasons. We are constrained to find this issue to be waived due to CHOP's failure to specifically identify its challenges to the weight of the evidence in its 1925(b) statement.

> In **Commonwealth v. Lord**, 553 Pa. 415, 719 A.2d 306 (1998), the Pennsylvania Supreme Court held that issues not included in a Pa.R.A.P.1925(b) statement are deemed waived on appeal.
>
>> The absence of a trial court opinion poses a substantial impediment to meaningful and effective appellate review. Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process.
>
> **Lord**, 553 Pa. at 417, 719 A.2d at 308. "When the trial court has to guess what issues an appellant is appealing, that is not enough for meaningful review." **Commonwealth v. Dowling**, 778 A.2d 683, 686 (Pa.Super.2001). "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." **In re Estate of Daubert**, 757 A.2d 962, 963 (Pa.Super.2000). "In other words, a Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all." **Dowling**, 778 A.2d at 686.

**Commonwealth v. Seibert**, 799 A.2d 54, 62 (Pa.Super. 2002). In **Seibert**, this Court found that the appellant's Rule 1925(b) statement that stated "the verdict of the jury was against the weight of the credible evidence as to all charges" was too vague to permit review, noting that the trial court summarily

dismissed the appellant's weight claim without discussing any specific challenge to the weight of the evidence. *Id.* *See also Commonwealth v. Lemon*, 804 A.2d 34, 37 (Pa.Super. 2002) (statements in Rule 1925(b) that "the verdict of the jury was against the evidence," "the verdict of the jury was against the weight of the evidence," and "the verdict was against the law" were too vague to permit meaningful review).

As noted above, CHOP's Rule 1925(b) statement only states that "[t]he trial court erred and/or abused its discretion in failing to award a new trial or a new trial on damages where the weight of the evidence does not support a verdict in [Appellees'] favor or the jury's damages award." Rule 1925(b) statement, 6/6/24, at 2.

As a result of this general language, the trial court summarily dismissed CHOP's challenge to the weight of the evidence with respect to CHOP's liability in general terms in its responsive Rule 1925(a) opinion, finding that the jury's verdict in favor of Appellees was not against the clear weight of the evidence to require a new trial. As CHOP's Rule 1925(b) statement was not sufficiently precise to allow the trial court to identify the issues CHOP wished to raise on appeal, the trial court did not readily apprehend or discuss any specific challenge to the weight of the evidence with respect to Appellees' claim that CHOP was liable for the negligence of its agents.

We further note that CHOP's challenge to the weight of the evidence supporting a verdict in Appellees' favor was not evident from context as transcripts of the six-day trial contain over one thousand pages of testimony,

the majority of which included detailed testimony of medical experts. While CHOP did raise a post-trial motion and supplemental post-trial motion seeking a new trial, it offered over twenty separate arguments in each filing in support of its weight of the evidence claim. Supplemental Post-Trial Motion, 3/5/24, at 5-10.

As a result, CHOP's failure to concisely identify its specific challenges to to the weight of the evidence in its Rule 1925(b) statement has impeded our ability to provide appellate review of its claim that the jury's verdict in favor of Appellees was against the weight of the evidence. Accordingly, we find CHOP's weight of the challenge to the jury's verdict on liability to be waived.

Lastly, CHOP claims the trial court abused its discretion in failing to grant a new trial on damages as it claims the jury's award of damages was excessive and based on improper considerations. CHOP did concisely state its Rule 1925(b) statement by asserting that it was entitled to a new trial as "the jury's award of damages is grossly excessive, punitive, and based on improper considerations, such as sympathy or compensation for the parents' grief." CHOP's Rule 1925(b) statement, at 3.

In reviewing this challenge, we are mindful of the following principles:

> Under Pennsylvania law, the decision to grant a remittitur depends on whether the award of compensatory damages lies beyond "the uncertain limits of fair and reasonable compensation" or whether the verdict "so shocks the conscience as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." **Potochnick v. Perry**, 861 A.2d 277, 285 (Pa. Super. 2004). This standard is highly deferential, because the trial judge serves not as finder of fact but as impartial courtroom authority with obligation to give great respect to the jury's function. **Ferrer v.**

> ***Trustees of Univ. of Pennsylvania***, 573 Pa. 310, 825 A.2d 591, 611 (2002). If the compensatory award is excessive, any remittitur must fix "the highest amount any jury could properly award." ***Neal v. Bavarian Motors [Inc.]***, 882 A.2d 1022, 1028 (Pa. Super. 2005). That amount "must necessarily be as high—and may well be higher—than the level the court would have deemed appropriate if working on a clean slate." ***Id.*** This Court is not free to substitute its judgment for that of the fact finder. "Rather, it is our task to determine whether the lower court committed a 'clear' or 'gross' abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur." ***Dubose v. Quinlan***, 125 A.3d 1231, 1244 (Pa. Super. 2015) (citation omitted).
>
> Each personal injury case "is unique and dependent on its own special circumstances." ***Kemp v. Philadelphia Transportation Co.***, 239 Pa.Super. 379, 361 A.2d 362, 364 (1976). Thus, noneconomic loss must be measured by experience rather than any mathematical formula. ***Martin v. Soblotney***, 502 Pa. 418, 466 A.2d 1022, 1025 (1983)[.] … For this reason, the law entrusts jurors, as the impartial acting voice of the community, to quantify noneconomic loss and compensation. ***Nelson v. Airco Welders Supply***, 107 A.3d 146, 161 (Pa. Super. 2014).

***Brown v. End Zone, Inc.***, 259 A.3d 473, 486 (Pa.Super. 2021) (quoting ***Hammons v. Ethicon, Inc.***, 190 A.3d 1248, 1285–86 (Pa.Super. 2018)). This Court has emphasized that "large verdicts are not necessarily excessive verdicts [as e]ach case is unique and dependent on its own special circumstances." ***Brown***, 259 A.3d 473, 486 (Pa.Super. 2021)

In this case, the jury awarded CHOP $10,000,000.00 in damages pursuant to the Wrongful Death Act and $4,000,000.00 pursuant to the Survival Act, for a total verdict of $14,000,000.00.

Pennsylvania's Wrongful Death Act, 42 Pa.C.S.A. § 8301, authorizes certain enumerated relatives of a person killed by another's negligence to sue for damages they have sustained as a result of the decedent's death.

*Tulewicz v. Se. Pa. Transp. Auth.*, 529 Pa. 588, 596, 606 A.2d 427, 431 (1992). "The damages recoverable in a wrongful death action include the present value of the services the deceased would have rendered to the family, had he or she lived, as well as funeral and medical expenses." *Kiser v. Schulte*, 538 Pa. 219, 226, 648 A.2d 1, 4 (1994). This Court has held that the Wrongful Death Act "permits a claimant to recover both economic and noneconomic damages, including damages for loss of society and comfort. Recovery under the act may also extend to the profound emotional and psychological loss suffered as a result of the death of a family member." *Kimble*, 264 A.3d at 801 (citing *Rettger v. UPMC Shadyside*, 991 A.2d 915, 932-33 (Pa.Super. 2010)).

In comparison, the Survival Act, 42 Pa.C.S.A. § 8302, provides for the continuation of the right of action accrued to the decedent, and therefore by his or her estate, as a result of the negligent act that caused his or her death. *Tulewicz*, 529 Pa. at 597, 606 A.2d at 431. "[D]amages awarded in a survival action include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power—less personal maintenance expenses, from the time of death through his estimated working life span." *Kiser*, 538 Pa. at 226–27, 648 A.2d at 4.

The parties agreed that the trial court should instruct the jury that Decedent's expected lifespan was estimated to be 80.5 years based on the testimony of Appellees' expert witness. However, the trial court also informed the jury that they were not bound to find that Decedent would have lived to

that age if the jurors believed that Decedent's life expectancy was more or less than this estimate.

The trial court also noted that the verdict sheet agreed upon by the parties only requested that the jury assign a lump sum for damages pursuant to the Wrongful Death Act and the Survival Act. The trial court noted that the verdict sheet did not require the jury to identify any components of its general verdicts such as the distinction between economic and noneconomic damages or any further subcategories.

The trial court rejected CHOP's claim that the damage awards were against the weight of the evidence. With respect to the jury's verdict pursuant to the Wrongful Death Act, the trial court reasoned as follows:

> The jurors heard testimony about activities that the Munoz parents did with Decedent's twin sister and the loss of the companionship that the parents felt when they were not able to do the same things with the Decedent. The jury heard that … "[Mrs. Munoz] was in love with Sammy." The jurors also heard testimony that the Decedent's lifespan was 80.5 years old. Given these facts, it is possible that the jury considered the loss of companionship and society of a small child to his parents, the companionship and help around the house he would have provided as a young adult, and the assistance he may have provided as an adult to his parents as they aged. These are all reasonable life stages contained within his expected lifespan, and all are categories of damages that are recoverable under the Wrongful Death Act. It is not within the purview of the Court nor Counsel to know what exact calculations went into determining the award, but as there are reasonable, allowable reasons for the jurors to award what they did, it is not for the Court to assume that the used improper considerations.

T.C.O., 8/9/24, at 17.

With respect to the jury's verdict pursuant to the Survival Act, the trial court provided the following analysis:

> Appellees' economic expert, David Hopkins, testified that the present value of net lost earning capacity and lost fringe benefits ranged from $1,880,000 to $6,194,960. This range was due to the low end being calculated based on the Decedent only achieving a high school degree and working until age 55, while the high end was calculated based on the Decedent obtaining a master's degree and working until age 70. Hopkins provided a table with four educational attainment categories - high school, associate's degree, bachelor's degree, and master's degree. The table also included four categories based on the assumed age the Decedent would stop working – 55, 60, 65, and 70.
>
> The jury awarded $4,000,000.00 under the Survival Action, which falls within the range provided by the economic expert. As such the award is not contrary to the evidence; rather, it suggests that the jury considered the evidence to conclude where in Hopkins's range of figures that the Decedent's losses fell.

*Id.* at 18-19.

Based on our review of the record and the circumstances presented in this litigation, we cannot find that the trial court abused its discretion in concluding that the jury's verdicts were supported by the weight of the evidence. We similarly decline to substitute our judgment for that of the jury, who was empowered to quantify the damages due under each statute. In particular, with respect to the jury's wrongful death award, "[o]ur jurisprudence has long emphasized that observing the testimony at trial and determining how much a relationship is worth to survivors is a determination best suited for the collective life experience and impartial community viewpoint of a jury." *Kimble*, 264 A.3d at 803.

We acknowledge that within its challenge to the weight of the evidence supporting the jury's damages award, CHOP claims that the jury's verdicts were based on improper considerations. First, CHOP argues that the jury was influenced by comments made by Appellees' counsel that were intended to evoke sympathy for Appellees and animosity toward CHOP. However, CHOP does not identify the statements allegedly made by Appellees' counsel in its appellate brief, demonstrate that it objected to such statements, or include any further analysis on this issue. It is not our responsibility to comb the extensive record for such statements.

CHOP also claims that the jury was improperly influenced to award an excessive amount of damages as a result for sympathy for Appellees due to their emotional displays during trial. CHOP points to two instances in which the trial court recognized that Appellees were either crying or hugging each other in front of the jury. N.T., 12/4/23, at 200; N.T., 12/8/23, at 145-150.

The record shows that the trial court convened with the parties outside the presence of the jury, acknowledged this litigation was emotionally difficult, but respectfully asked Appellees to step out of the courtroom to collect themselves if they felt the testimony would cause them to become visibly upset. *Id.* The trial court indicated that it would instruct the jury that it should not base its decision on empathy or sympathy. N.T., 12/8/23, at 148. The trial court did in fact include a specific instruction advising the jurors that it was not proper for sympathy to influence their emotions and that they

should not be "influenced by anything other than the law and evidence in this case." *Id*. at 255.

We find *Commonwealth v. Sanchez*, 614 Pa. 1, 39, 36 A.3d 24, 47 (2011) to be instructive. In *Sanchez*, the Supreme Court denied the appellant's claim that he was denied a fair trial when the trial court refused to remove the victim's daughter from the courtroom as a result of her emotional outbursts in crying during trial. The Supreme Court provided that "to obtain relief on a claim that the trial court abused its discretion in responding to spectator conduct at trial, appellant must show that the spectator's actions caused actual prejudice or were inherently prejudicial." *Id.* (citing *Commonwealth v. Philistin*, 565 Pa. 455, 774 A.2d 741, 743 (2001); *Carey v. Musladin*, 549 U.S. 70, 73, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006)). The Supreme Court emphasized that "[u]nless the unavoidable effect of the incident is to deny the defendant a fair trial, there is no error." *Sanchez*, 614 Pa. at 39–40, 36 A.3d at 47 (quoting *Philistin*, 774 A.2d at 743 (citation omitted)). Given that the appellant had not presented sufficient factual or legal support show actual prejudice and had not developed sufficient argument that a presumption of prejudice was warranted, the Supreme Court held that the trial court properly exercised its discretion in denying the appellant's request to remove or warn the victim's family against expressing emotion during trial. *Sanchez*, 614 Pa. at 40, 36 A.3d at 47-48.

In this case, CHOP did provide any further detail as the factual basis for its claim, did not ask for a specific curative instruction related to Appellees'

show of emotion, and did not ask for a mistrial. We agree with the trial court's finding that there was insufficient evidence to show the jury based any of its verdict on the fact that Appellees cried, hugged, and/or held hands during the trial as the trial court directed them outside the presence of the jury to refrain from doing so. Further, the trial court also emphasized that as the parties had agreed to allow the jury to award their verdicts in lump sums without further explanation of how the awards were apportioned, it would have been "mere guesswork" for the trial court to attempt to reduce the verdicts by assigning a portion which the jury allegedly awarded out of sympathy. *Id.* at 19-20.

As such, CHOP has failed to provide any factual or legal support for its claim of actual prejudice and has not attempted to argue that a presumption of prejudice was warranted under the circumstances. Therefore, we cannot find that CHOP is entitled to any relief on this claim.

For the foregoing reasons, we affirm the judgment in favor of Appellees.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/27/2025